961 A.2d 611

**Annaka M. LORINCZ**

v.

**Marcel LORINCZ.**

**No. 2060 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 3, 2008.

Allen R. Dyer, Ellicott City and Harold H. Burns, Jr., Baltimore, MD, for Appellant.

Stacy W. Harris, Towson, MD, for Appellee.

Panel: WOODWARD, GRAEFF and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

This appeal presents a number of intertwined questions about how to interpret the Maryland Child Support Guidelines: 1) which particular child care expenses are cognizable under the Guidelines and which are not?; 2) is the time unit for reckoning the parents' respective percentages of responsibility for child support that of a twelve-month-year or may it be broken down into such distinct units as, for example, nine months and three months respectively?; and 3) does a career move such as a transfer from graduate studies in research science to law school justify a finding of involuntary impoverishment?

The appellant, Annaka M. Lorincz ("Mother"), and the appellee, Marcel Lorincz ("Father"), were married in Virginia on January 6, 2001. Twin children, Alexandra Elise Lorincz and Jonas Begley Lorincz, were born to the couple on February 10, 2003. The couple separated on July 6, 2003, and entered into a Voluntary Separation and Property Settlement

Agreement on July 6, 2004. On August 2, 2004, the Mother was granted a Judgment of Absolute Divorce in the Circuit Court for Baltimore County. The Separation Agreement was merged into and made a part of the divorce decree. In the divorce decree, as in the Separation Agreement, the Mother was awarded primary physical custody of the children. The Father was directed to pay child support in the amount of $650 per month.

In the separation agreement, both parties explained how they had arrived at the $650 monthly child support payment. They began with a basic child support obligation of $905 per month based on the Maryland Child Support Guidelines and then added to it $215 per month for work-related child care expenses incurred by the Mother. Based on their respective percentages of the shared income, the Father was then responsible for 59.5% of the $1,120 monthly figure, and the Mother was responsible for 40.5%.

On October 30, 2006, the Mother filed in the Circuit Court for Baltimore County a Motion to Modify Child Support. The Mother sought to modify upward the amount of monthly child support by taking into account her increased child care costs. A hearing was held before a Master, and the findings and recommendations of the Master were adverse to the Mother. This appeal is from the August 29, 2007 order of the circuit court denying the Mother's exceptions to the Master's Report and Recommendations.

### The Mother's Status

The prominent factor in this case, controlling the answers to all of the subsumed questions, was the Mother's status as a student and/or as a wage earner. For a period of approximately four years, for two years prior to the divorce and for an additional two years after the divorce, the Mother was enrolled as a full time graduate student at the Johns Hopkins University Medical School, pursuing a Ph.D. In that capacity, she received a student stipend of $2,000 a month for a 12-month year, yielding an annual stipend of $24,000. This was the Mother's status as of both the time of the Separation

Agreement of July 2004 and the divorce decree of August 2004, pursuant to both of which the Father was to pay child support in the amount of $650 per month. That status remained unchanged for an additional two years. After the separation of the Mother and Father in 2003 and for the next three years while the Mother was at Hopkins, the Mother lived with her parents in Fredericksburg, Virginia, and commuted to Hopkins on a daily basis. The Mother's parents took care of their two grandchildren.

In the summer of 2006, however, the Mother decided on a career change. At that point, she was "four years along" in her doctoral program but had just failed her "third project." That meant that she "was going to have to start a new project and that's going to take at least two or three years to go for a new set of experiments." Had the Mother completed her studies at Hopkins and gotten her Ph.D., moreover, she estimated that she would have been a research scientist and could have expected, after two or three additional years, to get a job earning approximately $50,000 per year. A moment of decision was at hand.

In August of 2006, the Mother enrolled as a full-time student at the University of Virginia School of Law. For the first six months, she remained living with her parents in Fredericksburg, commuting to school on a daily basis for a trip of eighty-five miles each way. In January of 2007, however, she moved, along with her children, to Charlottesville. She enrolled the children in the University of Virginia Child Development Center, a child care facility for faculty, staff, and students. The cost for the two children was $1,100 per month.

For the first time, the cost of child care became a potentially significant factor in the child support calculations. Maryland Code, Family Law Article, § 12-204(g)(1) provides:

(g) Child care expenses.—

(1) Subject to paragraphs (2) and (3) of this subsection, *actual child care expenses incurred on behalf of a child due to employment or job search of either parent shall be added*

*to the basic obligation* and shall be divided between the parents in proportion to their adjusted actual incomes. (Emphasis supplied).

To pay her tuition and the living expenses for herself and the children of $30,700 per year, the Mother has borrowed $45,000 to $50,000 in student loans and an additional $19,000 from her father. She is slated to graduate from Virginia in May of 2009. In explaining her choice of Virginia as a law school, the Mother testified:

> I only wanted to apply to the top law schools because *your income potential is dramatically different if you attend a top law school* than if you attend a like lower tier law school. *For example, at Clifford Chance,*[1] *there is no one from a lower tier law school who works there.*

(Emphasis supplied). She further explained why she had not sought a part-time job.

> I think that *I would not be able to work part-time* and take care of two children and attend class and school time *and still maintain a GPA that would allow me to get a good job with a good salary* for my children so no, I don't think so. (Emphasis supplied).

In terms of going to law school on a part-time basis, the Mother explained that, of the top-flight schools, only Georgetown provided such an option and that she had applied to Georgetown but had not been accepted.

> I think it's in the best interest of the children that I spend as much time as I can with them. If I was working part-time, going to school full-time, I think that wouldn't leave very much time for me to spend with them. Also, as I mentioned, *going to a good law school is going to provide more and better opportunities,* not only for myself, but also for Jonas and Alexandra and that *kind of cuts out going*

---

**1.** Clifford Chance LLP is the law firm in New York City where the Mother was employed during the summers of 2007 and 2008 and where she has accepted a job offer for full time employment upon her graduation from law school in May 2009.

*part-time, except to go to Georgetown which I did apply to and I got rejected.*

(Emphasis supplied).

### Summer Job at Clifford Chance LLP

The Mother was offered and took a summer job at the law firm of Clifford Chance LLP in New York City for the summer of 2007. She earned $3,077 per week for 12 weeks, for a total of $36,424. The Mother hired a "nanny" to care for the children at a cost of $600 per week. The Mother was offered and has accepted a similar summer associate position for the summer of 2008. She has been offered and has accepted full-time permanent employment upon her law school graduation at an annual salary of $160,000 plus a discretionary bonus.

### The Father's Status

The Father lives in Washington, D.C., and is employed at T. Rowe Price as a service specialist. The Father has an undergraduate degree in Economics and a master's degree in International Trade from his native Slovakia. His salary has remained consistently one of $40,000 per year.

### The Master's Findings and Recommendations

Pursuant to the Mother's petition for a modification of child support, a hearing was held before a master on May 31, 2007. At the conclusion of the hearing, the master announced from the bench her findings and recommendations. We can conveniently group those recommendations into two distinct subject matter categories. The first concerns the Mother's effort to have included within the combined child support obligation the $1,100 per month expense for child care incurred during her nine-month school year at the University of Virginia. The master found that that was not an includable expense within the contemplation of the Maryland Child Support Guidelines.

*I don't agree with your argument, counsel, that this is job related day care. I'm not going to include the day care during the school year. If she, in fact, goes out and gets*

part-time employment and has day care, then [the Father] will be responsible in picking up his proportionate share. I don't know what that would be, depending on what her day care, but then again, it would be only that day care that enables her to work. Again, *three years of going to law school is not a job search* and I commend you for doing what you're doing and I think it's very difficult and very hard and you've made certain tough choices, one of them, you know, that you want to be in a top tiered law school, you know, to get that $160,000 starting job in New York, etcetera. Those are choices you've made.

(Emphasis supplied)

In its Opinion and Order of August 29, 2007, the circuit court noted the master's recommendation:

17. During the school year, Plaintiff's daycare expenses are not work-related and not taken into consideration for purposes of child support.

The second and ultimately very critical bit of reasoning on the part of the master was more *sub silentio* than express. In computing the Mother's income, the master declined to do so on an annual basis. The master treated the three summer months, when the Mother was a well paid summer associate at Clifford Chance LLP in New York, as a distinct and self-contained accounting period. She then treated the non-income-producing nine-month school year as a water-tight accountability compartment of its own. Based upon this splitting of the year into distinct and unrelated parts, the master found that the Mother enjoyed a significant income during June, July, and August but then lapsed into a state of voluntary impoverishment from September through May. Based upon that implicit finding of "voluntary impoverishment," the master charged the Mother with an addition $24,000 of imputed potential income, based upon what her annual stipend had been while a graduate student at Hopkins.

*Mother, at the time of the divorce, was working on her Ph.D. at Hopkins receiving a stipend of $24,000 a year. She voluntarily left the Ph.D. program for a career change,*

applied to UVA and is now a full-time law student at UVA. In January she put the children in day care at the cost of $1,100. *She has no part-time employment during that period of time.* She is currently living on student loans and gifts from father, however, this summer she has taken a job in New York at $3,000, it's actually $3,077, I think, per week with day care at $600 per week. *Mother has never looked for part-time employment during the school year and she elected not to apply to law schools with night schools or part-time programs unless it was a top tier school* and, I mean, the only one that met that criteria for a part-time or night-time basis, I don't know which, was Georgetown which she did not get into. The Court finds, *I find that she can make $24,000 at least while she is in school, the amount that she* made that she, *the job that she left,* okay? So that *during the school year, I'm imputing income to her of $24,000.*

(Emphasis supplied).

In her Opinion and Order, the circuit court trial judge recited the master's recommendation in that regard.

15. During the school year, Plaintiff's imputed income is $24,000.00, the stipend received while working towards her Ph.D.

Because the year was thus divided into two parts, the recommended child support payments by the Father fluctuated accordingly between feast and famine.

19. Effective November 1, 2006, Defendant shall pay child support in the amount of $704.00 per month.

20. During the months of June, July, and August of 2007, Defendant shall pay child support in the amount of $970.00 per month.

21. Defendant shall resume monthly payments of $704.00 on September 1, 2007.

### The Circuit Court Rulings

On June 11, 2007, the Mother filed with the circuit court her Exceptions to the Master's Report. As recited in the Opinion

and Order of the circuit court, there are three of those exceptions that are still pertinent.

1. The Master erred by finding that Plaintiff voluntarily impoverished herself by going to law school.

2. The Master erred by imputing $2,000.00 per month as income to Plaintiff during the school year.

. . . .

4. The Master erred by failing to recognize Plaintiff's daycare expenses during the school year as work-related expenses and include them in the child support calculation.

The circuit court indicated that it was ruling on the exceptions and making its ultimate determinations in the case "based on the Report of Master Brown, a review of the entire file, the arguments presented by counsel, and the relevant case law." The circuit court denied all three of the Mother's exceptions referred to above. The Mother has taken this timely appeal from that decision.

### Child Care Expenses "Due to Employment or Job Search"

We turn first to the Mother's contention that the circuit court erred in denying her exception to the master's ruling that her $1,100 per month expense for child care during the school year at Virginia was not a cognizable "child care expense" within the contemplation of Family Law Article, § 12–204(g)(1). We repeat that definition.

(g) Child care expenses.—

(1) Subject to paragraphs (2) and (3) of this subsection, actual child *care expenses* incurred on behalf of a child *due to employment or job search* of either parent shall be added to the basic obligation and shall be divided between the parents in proportion to their adjusted actual incomes.

(Emphasis supplied).

Quite obviously, that provision does not cover all "actual child care expenses incurred on behalf of a child" but only those particular child care expenses incurred "due to employment or job search." The General Assembly could, of

course, have been more generous in its coverage, but it was not. It is not for judges, of course, to improve upon what the legislature did or did not do. No matter how commendable the reason for incurring child care expenses, those expenses are not covered unless they are "due to employment or job search." The child care expenses incurred by the Mother during her 12 weeks as a summer associate in New York are, for instance, a textbook example of what is meant by the phrase "due to employment." She needed to hire a babysitter so she could go to work. The clear meaning of "due to employment" means due to actual current employment, not long range preparation for potential employment. We deem the phrase "due to job search" to be similarly limited to a direct and immediate relationship between the child care and the job search and not to embrace some more distant and attenuated philosophical association between the two.

At the hearing on the exceptions, the judge was sympathetic to the Mother's situation and complimentary of her efforts.

This Court does want to make clear that *Plaintiff is to be commended for her decision to attend law school.* It has not escaped this Court's attention that Plaintiff left the doctoral program in July of 2006 and immediately enrolled in law school in August of 2006. There is no question that *Plaintiff's decision to leave Johns Hopkins University was,* at that time, *for the purpose of pursuing a different career, not to avoid working.* This Court has also taken into consideration the fact that *Plaintiff was willing to travel 170 miles round-trip to attend law school so that her parents could take care of the minor children.* To make this trip five days a week, attend classes, complete assignments, and take care of two young children would be exhausting to say the least. *This Court does not fault Plaintiff for making the decision to move closer to school* despite the fact that, as a result, she would have to enroll the children in daycare.

(Emphasis supplied).

Notwithstanding that approbation, nobility of purpose is not the measure of statutory coverage. The court's ruling was

compelled by the legislative language and by the lack of any authority permitting the court to expand on the legislative purpose.

As to Plaintiff's fourth exception, that the Master erred by failing to recognize Plaintiff's daycare expenses during the school year as work-related expenses and include them in the child support calculation, *the exception is DENIED.* Pursuant to Family Law Article § 12–204(g)(1), "child care expenses incurred on behalf of a child *due to employment or job search* of either parent shall be added to the basic obligation and shall be divided between the parents in proportion to their adjusted actual incomes." Plaintiff argues that attending law school should fall within the purview of the statute because, upon completion, there is the potential for a lucrative career. *Plaintiff,* however, *has not cited any Maryland authority for her position, nor has she provided an analysis of the relevant legislative history to support her position. It is not within the province of this Court to expand the meaning of the statute* beyond what the Legislature intended.

(Emphasis supplied). We affirm that much of the court's ruling.

The appellant makes an appealing argument for why such school-related expenses should be covered by the Child Support Guidelines. It is emotionally difficult to reject the argument. It is an argument, however, that should properly be made to the legislature and not to the courts. There are arguments and counterarguments that should be weighed and considered by the appropriate law-making authority. If the General Assembly were persuaded of the merit of the appellant's argument, it could with a phrase or two easily broaden the coverage of the Child Support Guidelines. The Tennessee Child Support Guidelines, for example, expressly provide:

In an appropriate case, *the tribunal may consider the childcare costs associated with a parent's* job search or the *training or education* of either parent *necessary to obtain a job or enhance earning potential,* not to exceed a reasonable time as determined by the tribunal, if the parent proves by

a preponderance of the evidence that the job search, job training, or education will benefit the children being supported.

Tenn. Comp. R. & Regs. 1240–2–4–.02(29)(b) (2008) (emphasis supplied). For other examples of express coverage, see Ga. Code Ann. § 19–6–15 (2008); Col.Rev.Stat. § 14–10–115(9)(a) (2005); Fla. Stat. § 61–30(7). It is, in the last analysis, a legislative decision.

## To Annualize or Not to Annualize?

█ The tide now turns in the Mother's favor. A key contention of the Mother is that such secondary decisions as 1) to declare her to have voluntarily impoverished herself and 2) to impute potential income to her could never have been made but for the erroneous threshold decision to fragment the accounting year into two self-standing and unrelated parts. We agree. Both parties hasten to warn us that we are here called upon to write on a clean slate. From the absence of any authority one way or the other, the Father argues that there is nothing to prohibit breaking the year into smaller pieces. The Mother counters that there is nothing to permit it. It is for just such situations, of course, that we are here.

The engine driving the Father's effort to split the accounting year for child support reckoning into distinct and airtight compartments is his desire to lower his percentage of responsibility for the summer child care expenses. The Mother's salary as a summer associate was a big chunk of the combined yearly income of the Mother and Father combined, approximately 48% of the total. Proportionately big were her child care expenses in Manhattan for the summer, $600 per week for a three-month total of $7,200. There was no suggestion that those expenses were not "due to employment" or that the Father was not responsible for his proper percentages of those expenses. The only question was that of what was a "proper" percentage. On the basis of the twelve-month year, the Father would have been responsible for approximately 52% of the summer child care expenses. If, on the other hand, those three summer months could be considered in a

vacuum as a separate accounting period, the Father's percentage of responsibility for the summer child care expenses would drop precipitously. All of the Mother's income for the year fell within that period, but only 25% of the Father's $40,000 per annum salary did. For the three summer months in a vacuum, his was roughly 20% of the combined income and, according to his analysis, his should have been a roughly 20% share of the joint responsibility. He wished to be held responsible for only 20% of the $7,200 in summer child care expenses and not for 52% of them. It is a difference between roughly $1,440 and roughly $3,744.

There is, to be sure, no express holding as to whether to annualize or not to annualize before crunching the numbers in a child support calculation. There are, however, ingrained habits that may reflect subconscious authority, or at least represent scantily analyzed tradition. We have surveyed the extensive body of Maryland caselaw on voluntary impoverishment, from *John O. v. Jane O.* in 1992 through *Gordon v. Gordon* in 2007,[2] and in every instance the assessment of actual income and/or imputation of potential income was on a *per annum* basis. There was nowhere anything resembling the seesawing court order in this case, setting fluctuating award figures for three prosperous months followed by nine

---

**2.** *John O. v. Jane O.*, 90 Md.App. 406, 419–23, 601 A.2d 149 (1992); *In re Joshua W.*, 94 Md.App. 486, 491–94, 617 A.2d 1154 (1993); *Goldberger v. Goldberger*, 96 Md.App. 313, 322–29, 624 A.2d 1328 (1993); *Reuter v. Reuter*, 102 Md.App. 212, 220–24, 649 A.2d 24 (1994); *Moore v. Tseronis*, 106 Md.App. 275, 278–86, 664 A.2d 427 (1995); *Wills v. Jones*, 340 Md. 480, 483–97, 667 A.2d 331 (1995); *Wagner v. Wagner*, 109 Md.App. 1, 42–47, 674 A.2d 1 (1996); *Schwartz v. Wagner*, 116 Md.App. 720, 723–25, 698 A.2d 1222 (1997); *Digges v. Digges*, 126 Md.App. 361, 730 A.2d 202, *cert. denied*, 356 Md. 17, 736 A.2d 1065 (1999); *Dunlap v. Fiorenza*, 128 Md.App. 357, 363–66, 738 A.2d 312, *cert. denied*, 357 Md. 191, 742 A.2d 520 (1999); *Sczudlo v. Berry*, 129 Md.App. 529, 542–43, 743 A.2d 268 (1999); *Durkee v. Durkee*, 144 Md.App. 161, 181–87, 797 A.2d 94 (2002); *Stull v. Stull*, 144 Md.App. 237, 245–49, 797 A.2d 809 (2002); *Petitto v. Petitto*, 147 Md.App. 280, 311–19, 808 A.2d 809 (2002); *Malin v. Mininberg*, 153 Md.App. 358, 393–405, 837 A.2d 178 (2003); *Gordon v. Gordon*, 174 Md.App. 583, 643–46, 923 A.2d 149 (2007).

months of impoverishment followed by another three prosperous months and so on up and down *ad infinitum.*

In *Smith v. Freeman,* 149 Md.App. 1, 814 A.2d 65 (2002), a mother sought to modify upward a child support award from the father, a professional football player with the Green Bay Packers whose salary had increased from one million dollars to 3.2 million dollars. Although the salary in question was for a five-month professional season, the father's ability to pay and his obligation to pay were averaged out on a *per annum* basis. "[T]he parties agreed that the appellee enjoyed a gross monthly income of $258,000. *On an annual basis,* appellee's monthly child support payments of $3,500 amounted to $42,000." 149 Md.App. at 6, 814 A.2d 65 (emphasis supplied). To be sure, the issue now before us never arose in that case. The notion, however, that a highly paid professional athlete who declines to work as a cab driver during the off-season has voluntarily impoverished himself for a half of every year is absurd.

In *Johnson v. Johnson,* 152 Md.App. 609, 833 A.2d 46 (2003), a wife sought an increase in child support when she learned that her husband had received a $41,000 bonus in addition to his $80,000 a year salary. The bonus month for the husband's company was always February. The actual holding of the case was that the bonus was a non-exempt part of the husband's income. The court then, without comment, proceeded to add the bonus to the yearly income figure and calculate the monthly child support figure by averaging out the income to a monthly figure. In many businesses, high ranking executives regularly receive a significant part of their income in the form of annual bonuses. It would be absurd in a child support case to order a very high award of child support for the bonus month and then significantly lesser awards for the less rewarding months. The best, if not the only feasible, measuring rod for determining the amount of and for ordering support payments is on a *per annum* basis.

As we write upon a clean slate, there is, moreover, an internal logic that guides the chalk. In this case, the Father would divide the year, for impoverishment purposes, into

alternating periods of three fat months and nine lean months. Were he to prevail, will the next case divide the year into nine fat months and three lean months? Or divide the year into more than two fragments? May the million dollar athlete be deemed to have voluntarily impoverished himself during the off season? May the high-powered executive be deemed to have voluntarily impoverished himself for a month if he takes a month of unpaid vacation? How will careful planners save up for a rainy day if the rainy day itself may be declared to be a cognizable unit of voluntary impoverishment? The potential shoals and shallows of venturing forth onto such uncharted seas are too numerous to risk. *Per annum* analysis remains a safe harbor.

This case itself graphically reveals the fault line in the Father's reasoning that the Mother's nine lean months of law school can, for analytic purposes, be hermetically sealed off from her three fat months as a summer associate. The two periods are inextricably intertwined and the fruits of summer cannot be understood except in relation to the seedtime that preceded them. The Mother's reward for being a summer associate of $36,424 would in and of itself be a respectable annual salary. Her salary for 12 weeks is in the same ballpark, for instance, as is the Father's salary of $40,000 for 12 months. Why? The remuneration of a summer associate is not a measure of the value of the summer associate's work product. The inflated salary can only be understood as a law firm's recruiting tactic, as something designed to attract and to lock in bright future prospects for the law firm.[3] For a hot prospect, a lucrative summer job is bait.[4] At the hearing

---

3. In the Mother's case, this tactic was successful. She testified:

    MR. WOOD: Now, is it your expectation that you receive a full-time offer as a result of this summer employment?

    MS. LORINCZ: Yes, that's part of the reason I wanted to go to Clifford Chance over Paul Hastings because they have a policy where summer associates are given full-time offers for when they graduate as long as you don't do something kind of really, really stupid.

4. Hypothesize a summer associate saying to the partners, "I have enjoyed myself so much this summer that I have decided to quit law

before the master, the Mother characterized the summer program, "It's more of just an introduction to the firm and a training program." The Mother in this case only commanded a summer salary of $36,424 because of her being a full-time student at a top-tier law school who maintained a high grade point average. Far from impoverishing herself during the winter, she, in effect even if not literally, was earning the dollars that would be dangled before her when summer came. The two periods have to be averaged out. They have to be, in a word, annualized. We do not hesitate to write that on the hitherto clean slate.

### Voluntary Impoverishment

■ The child support guidelines first became a part of Maryland law by the enactment of Chapter 2 of the Acts of 1989. In the initial version of Senate Bill 49, the definition of "income" included "potential income ... if the parent is unemployed or underemployed." At the suggestion of the House Judiciary Committee, the final act substituted "voluntarily impoverished" for "voluntarily unemployed or underemployed."

The computation of child support is based on the combined income of the parents. Income may be actual or potential. Family Law Article, § 12–201(h) defines "income":

(h) Income.—"Income" means:

(1) actual income of a parent, if the parent is employed to full capacity; or

(2) *potential income* of a parent, *if the parent is voluntarily impoverished.*

(Emphasis supplied). Section 12–204(b)(1) goes on to provide, in pertinent part:

(b) Voluntarily impoverished parent.—

---

school and to continue, as a paralegal, to do for you on a permanent basis what I have been doing for you this summer." The salary offer, if any, would plummet. Realistically, the summer associate's work product is not worth that much as a work product.

(1) Except as provided in paragraph (2) of this subsection if *a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income.*

(Emphasis supplied). Section 12–201(j) provides a further definition of "potential income":

(j) Potential income.—*"Potential income" means income attributed to a parent determined by the parent's employment potential* and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

(Emphasis supplied).

In *Wills v. Jones,* 340 Md. 480, 485, 667 A.2d 331 (1995), Chief Judge Robert Murphy explained for the Court of Appeals why the concept of voluntary impoverishment is essential in determining the amount of and allocation of responsibility for child support awards.

Because the parents' income levels determine the amount of support that a child receives, *it is imperative to accurately assess the parents' respective incomes. It is equally imperative that parents be prevented from avoiding their support obligations by purposefully reducing their income.* Thus, ... a parent's "potential income" may be used to calculate the amount of the support obligation if the parent is "voluntarily impoverished." A parent's potential income is defined as "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community."

(Emphasis supplied).

What has come to be the accepted definition of voluntary impoverishment was first articulated by Judge Dana Levitz (specially assigned) for this Court in *Goldberger v. Goldberger,* 96 Md.App. 313, 327, 624 A.2d 1328 (1993).

Accordingly, we now hold that, for purposes of the child support guidelines, *a parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.*

(Emphasis supplied). See also *Wills v. Jones,* 340 Md. 480, 494, 667 A.2d 331 (1995); *Malin v. Mininberg,* 153 Md.App. 358, 395, 837 A.2d 178 (2003).

In listing the factors that should be considered in determining whether a parent is voluntarily impoverished, virtually every Maryland case to come after it has followed and quoted with approval the list according to *John O. v. Jane O.,* 90 Md.App. 406, 422, 601 A.2d 149 (1992).

(1) his or her current physical condition;

(2) his or her respective level of education;

(3) the timing of any change in employment or other financial circumstances relative to the divorce proceedings;

(4) the relationship between the parties prior to the initiation of divorce proceedings;

(5) his or her efforts to find and retain employment;

(6) his or her efforts to secure retraining if that is needed;

(7) whether he or she has ever withheld support;

(8) his or her past work history;

(9) the area in which the parties live and the status of the job market there; and

(10) any other considerations presented by either party.

See *Gordon v. Gordon,* 174 Md.App. 583, 645, 923 A.2d 149 (2007); *Malin v. Mininberg,* 153 Md.App. at 396, 837 A.2d 178; *Durkee v. Durkee,* 144 Md.App. 161, 183–84, 797 A.2d 94 (2002).

Whereas, however, *John O. v. Jane O.,* 90 Md.App. at 421, 601 A.2d 149, had added to the definition of voluntary impoverishment the mental element or purpose that the act "to reduce oneself to poverty" had to be done "with the intention of avoiding child support or spousal obligations," *Wills v. Jones,* 340 Md. at 494, 667 A.2d 331, rejected that reading of

"voluntary" as "too narrow" and ordered a correction of course in that limited regard.

> The inquiry into the parent's intent adopted in *John O.*, however, *is too narrow.* In determining whether a parent is voluntarily impoverished, *the question is whether a parent's impoverishment is voluntary, not whether the parent has voluntarily avoided paying child support. The parent's intention regarding support payments,* therefore, *is irrelevant.* It is true that parents who impoverish themselves "with the intention of avoiding child support ... obligations" are voluntarily impoverished. But, as the court recognized in *Goldberger,* 96 Md.App. at 326–27, 624 A.2d 1328, *a parent who has become impoverished by choice is "voluntarily impoverished" regardless of the parent's intent regarding his or her child support obligations.*

(Emphasis supplied).

Turning to the present case, once the Mother's income for the year is annualized, there is no way that she could be deemed to have voluntarily impoverished herself. Voluntary impoverishment implies some downward movement or at least a deliberate failure to move upward. In this case, the Mother actually enjoyed a 50% surge in her annual income, going from $24,000 *per annum* to $36,424 *per annum.* At the hearing on the exceptions to the Master's Findings and Recommendations, the hearing judge seems to us to have captured the gist of the case.

> THE COURT: Isn't the real question, *we're not really talking about voluntary impoverishment, are we, because she's actually making more money than she made before?* Isn't the crux of this case something that hasn't been decided in Maryland, which is whether daycare expenses while you're in the process of getting a different job, whether they are covered? Isn't that what you guys are up in arms about?

(Emphasis supplied).

Although the judge, in her final Opinion and Order, unexpectedly veered off in a diametrically opposite direction, at the hearing she seemed to be calling the game unerringly.

THE COURT: She's got 24,000 when she is doing whatever she is doing at Hopkins, then she hops off to New York where she's making the kind of money we wish we were making. So she ends up making [36] or something from the summer. *She's not voluntarily impoverished. That really isn't an issue I don't think.*

(Emphasis supplied).

The judge sensed, moreover, that in the long run it was in the interest of the Father as well as of the Mother to have the Mother do exactly what she was doing.[5]

THE COURT: [I]n the end *isn't that going to benefit everybody?* Am I not allowed to look at that? *She is going to be buying and selling us. Then that's going to benefit Mr. Lorincz.*

(Emphasis supplied).

The court commented favorably not only on where the Mother was ultimately going but on where the Mother already was.

THE COURT: I don't think you are making that kind of money around here. I mean, I know starting salaries at Venable are higher than what I make but they're not 160. *By going to UVA and going full time and getting good grades, she put herself in a position where she would make more money which benefits essentially everybody.*

So while I understand that she could have done a lot of other things, I wonder if that is really solid reasoning because *had she worked part time, maybe her grades wouldn't be so good, she wouldn't have gotten the big fat New York job,* and so I just come back to *in the end she makes 36 from the law school,* then *she made 24 from the*

---

**5.** Once the Mother enters into her new job at $160,000 per year, approximately five months hence, the Father, at an income of $40,000 per year, will see his percentage of the child support obligation shrink from what is now about 52% to 20%. One would expect him to be doing everything he could to facilitate the arrival of that happy day and not to be second-guessing the Mother's decision of how to get there.

*dead end research job* that she apparently failed three times, and so *what am I missing?*

(Emphasis supplied).

At the end of the day, the direction the court was taking on the issue of voluntary impoverishment seemed right on target.

THE COURT: I don't mean to cut you off. *I'm leaning towards there's no voluntary impoverishment. She's making more now than she was then.*

(Emphasis supplied).

Between the hearing on July 25, 2007, and the Opinion and Order of August 22, 2007, however, the tilt of the hearing judge shifted diametrically.

*As to Plaintiff's first exception,* that the Master erred by finding that Plaintiff voluntarily impoverished herself by going to law school, *the exception is DENIED.* In *Goldberger v. Goldberger,* 96 Md.App. 313, 624 A.2d 1328 (1993), the Court of Special Appeals made clear that a parent's decision to avoid supporting his or her children is not necessary to support a finding of voluntary impoverishment. *Id.* at 326, 624 A.2d 1328. The Court held that, "a parent shall be considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources." Plaintiff testified that she discontinued her graduate studies after her third project failed. She also testified that a new project would take another two or three years, and during those years, she would continue to receive an annual stipend of $24,000.00. She further testified that, upon completion of her Ph.D., she would be capable of earning approximately $50,000.00.

Based on Plaintiff's testimony, this Court certainly understands her decision to pursue a legal education. The time it will take to earn her law degree is equivalent to the amount of time it would have taken for her to complete a new project. *Plaintiff, in all likelihood, has also increased her earning potential by making the decision to attend law school.*

*That, however, is not the end of the Court's inquiry with respect to voluntary impoverishment. Plaintiff made the decision to apply to only one school with a part-time program. She chose to attend the University of Virginia, despite the fact that the school does not have a part-time or night program for its students.* Plaintiff made these decisions freely and voluntarily, without influence from factors beyond her control. While it may be preferable to attend school without having employment distract from studying, a parent with two young children to support has to make decisions with the welfare of his or her children in mind. *It is clear from Plaintiff's testimony that her decision to attend law school was based, in part, on her desire to obtain a higher income in order to provide more for her family.* But, Plaintiff cannot ignore her obligation to provide for her children now, during the course of her studies, and *this Court does find that Plaintiff has voluntarily impoverished herself.*

(Emphasis supplied).

▇ That determination of voluntary impoverishment was of necessity based upon a finding not that the Mother was voluntarily impoverished for the entire year but upon an implicit finding that she was voluntarily impoverished for only the nine months of the school year. See *Dunlap v. Fiorenza,* 128 Md.App. 357, 364, 738 A.2d 312 (1999) ("[T]he statute does not require the court to articulate on the record its consideration of each and every factor when reaching a determination of child support."). In determining child support, potential income will be imputed to a parent only for such time as the parent has been properly found to be voluntarily impoverished. In denying the Mother's second exception and in following the Master's Recommendation in that regard, the hearing judge ruled that $2,000 per month in potential income would be imputed to the Mother but would only be so imputed for the nine months of the school year.

*As to Plaintiff's second exception, that the Master erred by imputing $2,000.00 per month as income to Plaintiff during the school year, the exception is DENIED.* Pursu-

ant to Family Law Article § 12–204(b)(1), *"if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income."* Potential income is defined in § 12–201(j) as "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." With respect to employment potential, Plaintiff testified that between the time that she graduated from college and started her program at Johns Hopkins, she worked at a Virginia Marine Science Lab and earned $8.00 per hour. She also testified that she is presently qualified to do that work. *Regarding recent work history, Plaintiff earned $2,000.00 per month while working at Johns Hopkins.* There was no testimony provided with respect to the prevailing job opportunities or earnings levels in the community. However, based on her education, qualifications, and most recent work history, *this Court imputes $2,000.00 per month to Plaintiff as income during the school year.*

(Emphasis supplied).

"Voluntary impoverishment," by its very words, tells us that the impoverishment in question must be voluntary. In *Wills v. Jones,* 340 Md. at 489, 667 A.2d 331, the Court of Appeals underscored that self-evident truth in no uncertain terms.

> To determine whether a parent is voluntarily impoverished, ... a court must inquire as to the parent's motivations and intentions.

In this case, the Mother's relentless and unremitting purpose was not to impoverish herself but to improve her financial position. Her very reason for leaving the Ph.D. program at Johns Hopkins was that a future career as a research scientist was low paying. Her calculated strategy of choosing a top-tier law school and then maintaining a high G.P.A. was to enhance her appeal in the eyes of high-paying law firms. The Mother's effort, moreover, has proved successful. She has been promised and has accepted a job paying $160,000 a

year plus a discretionary bonus five months from now, in comparison with the prospect of making $50,000 a year as a research scientist three or four years from now. In all of the voluntary impoverishment cases, the income either went down or stayed down. In this case it is going up, well beyond anything it had ever before been. Even in the short term, to wit, the respective academic seedtimes, the interim financial reward has gone upward from a stipend of $24,000 a year to a summer associateship of $36,424 a year. The movement has been, both in the short term and the long term, upward, not downward. That is the diametric opposite of impoverishment.

In looking at the factors first articulated in *John O. v. Jane O.* and regularly resubscribed to in every later case, one of those factors is "her level of education." The Mother is within five months of obtaining a highly prestigious J.D. degree, which will make her a very marketable product with excellent prospects for a high-paying income. She did not heretofore enjoy that level of educational attainment and has not, therefore, failed to exploit earlier career opportunities.

Another of the *John O. v. Jane O.* factors is "the timing of any change in employment or other financial circumstances relative to the divorce proceedings." The Mother and Father separated in 2003 and were legally divorced in 2004. The Mother remained in the graduate program at Hopkins for three years after the separation and for two years after the divorce. She did not change her career path until 2006. The change was clearly not some mean-spirited tactic designed to place the Father at a disadvantage in terms of his share of child support. In analyzing this *John O. v. Jane O.* factor and in concluding that the appellant there had not voluntarily impoverished himself, this Court in *Moore v. Tseronis*, 106 Md.App. 275, 283, 664 A.2d 427 (1995), observed that "appellant's change in employment, and thus the change in his financial situation, occurred almost three years after the parties' divorce." Indeed, after the Mother in this case moved from the Ph.D. program to the J.D. program, her salary as a summer associate raised her annual income by 50% and

lowered accordingly the Father's annual percentage share of child support responsibility.

Another *John O. v. Jane O.* factor is "her efforts to find employment." The Mother's academic attainments, her host of job applications, and her receiving of the $160,000 a year job offer all attest to success with respect to this factor. The factor described as "her efforts to secure retraining if that is needed" is so intertwined that separate comment would be redundant.

Another of the factors listed by *John O. v. Jane O.* is that of "whether she has ever withheld support." She has not. She has always been her children's primary care giver. The factor of "past work history" is an important one in cases wherein one of the parents earlier held a high paying job and then, for no apparent good reason, gave it up. The Mother in this case has never been anything but a student. In terms of any remuneration associated with her student status, she has actually moved up the financial ladder from a stipend of $24,000 a year to a summer associateship paying $36,424.

Another listed factor is "the area in which the parties live and the status of the job market there." As the polar opposite of the parent in *Moore v. Tseronis,* 106 Md.App. at 283, 664 A.2d 427, who moved from Baltimore City to the relatively impoverished economy of Garrett County, the Mother here moved from Baltimore and/or Charlottesville to the gold-plated towers of Manhattan. The move was expressly made for the purpose of enhancing her salary, not that of depressing it. Every move she has made has been upward, not downward. In *Moore v. Tseronis,* the appellant, who was found by the trial court to have voluntarily impoverished himself, moved from Baltimore City, where he was making approximately $35,000 a year, to his new wife's home in Garrett County, where he made only $16,000 a year. In holding that that did not constitute a case of voluntary impoverishment, Judge Bloom stated for this Court.

> Our review of the evidence persuades us that *the trial court's finding that appellant was voluntarily impoverished was erroneous.*

We have no doubt that appellant's income would have been greater than it now is if he had not moved from Baltimore to a less affluent area. *We do not believe, however, that a court can restrict a parent's choice of residence in order to insure that he or she remains in or moves to the highest wage earning area.* While a parent must take into consideration his or her child support obligation when making job and location choices, such considerations should not be immobilizing.

106 Md.App. at 283, 664 A.2d 427 (emphasis supplied).

The decision of this Court that is completely dispositive is *Malin v. Mininberg*, 153 Md.App. 358, 837 A.2d 178 (2003). The trial court had held that the husband had voluntarily impoverished himself when he abandoned his medical career and "decided to pursue a new career in business and enrolled as a full time student in graduate school." *Id.* at 402, 837 A.2d 178. The change in career was made because the husband suffered "from a substance abuse problem" and it was "not in his best interest to continue to practice medicine." *Id.* at 394, 837 A.2d 178. Even though the husband would, during his transitional retraining period, be receiving $10,000 a month from his disability insurance policies, the trial court found that the husband, as a doctor, could make far more than he was receiving from the disability insurance benefits and that he was, therefore, voluntarily underemployed. Even though the trial court acknowledged that the husband was "suffering from an addiction which played a large role in his decision not to practice anesthesiology," it nonetheless found that he was voluntarily impoverished. We observed:

[T]he court's finding of voluntary impoverishment was predicated on Dr. Malin's decision to abandon his career as a physician. In the court's view, Dr. Malin has many lucrative "options" available to him in medicine.

*Id.* at 402, 837 A.2d 178.

Judge Hollander, writing for this Court, first engaged in a definitive survey of every Maryland case touching upon

voluntary impoverishment, *id.* at 395–402, 837 A.2d 178, and then focused on the intent and purpose behind the change in the financial status of a parent being analyzed.

> To determine whether a parent is voluntarily impoverished . . . *a court must inquire as to the parent's motivations and intentions.*

*Id.* at 397, 837 A.2d 178 (emphasis supplied). Although the intent, in order to constitute voluntary impoverishment, need not be to avoid paying one's child support obligation, *Wills v. Jones,* 340 Md. at 494, 667 A.2d 331, the intent and purpose in making a change in employment must nonetheless be actually to lower the level of income. The court must then examine the reason behind that intent or purpose. In reversing the trial court, this Court first noted that the career change in that case was not remotely undertaken for the purposes of avoiding the child support obligation.

> Significantly, there was not a shred of evidence that appellant gave up his medical career to avoid his duty of parental support.

153 Md.App. at 402, 837 A.2d 178.

Above and beyond that consideration, the reason for making a change in career or in employment is still critically important. Judge Hollander explained that a parent is not required to forego a long-term improvement in order to obtain a short-term advantage.

> Here, the court seemed to fault appellant for making a reasoned decision to extricate himself from a career in medicine, because the pressures of such work, coupled with the access to drugs that it affords, make the career detrimental to his health. Under these circumstances, *where appellant had a legitimate ground to relinquish his medical career, and pursued retraining* at a time when he could afford to do so because of his sizeable insurance benefits, *we cannot sustain the court's finding of voluntary impoverishment.* In effect, the court would consign appellant to a career in medicine, despite the potential adverse impact on his health and freedom, solely because a medical career

*might* yield greater earnings. *A decision on that basis is a short term answer to a long term problem; surely, it is not a solution.*

*Id.* at 403–04, 837 A.2d 178 (emphasis supplied).

The Father in this case seems to be bemoaning the fact that the Mother is not remaining in her graduate studies at Hopkins with its stipend of $2,000 per month but is engaged in a career change that will in very short order result in a significantly improved financial situation to the benefit of all parties. Even in the short term, the yearly income during the transitional or bridge period has improved by 50%. *Malin v. Mininberg,* 153 Md.App. at 404, 837 A.2d 178, gave very clear guidance in this regard.

[I]n a free society, *appellant should not be forced to maintain a particular career when* there is a reasonable basis to believe that to do so would jeopardize his health or liberty; *his current income is hardly insignificant; and the alternative career may yield a respectable income.* Put another way, *a parent's child support obligation should not be used to shackle the parent by preventing him or her from making a needed lifestyle change, based on valid reasons,* particularly when, as here, the parent is able to provide reasonable child support.

(Emphasis supplied).

Long-term improvement, we there pointed out, is a factor that cannot be totally disregarded.

*Appellant's retraining may actually result in a more secure economic future for [the child] than would be obtained from appellant's employment in a low level medical position.* Under the circumstances attendant here, *it was to appellant's credit that he sought to pursue a new career* at a time when he had a steady and significant income stream from his disability policies.

153 Md.App. at 405, 837 A.2d 178 (emphasis supplied).

In *Gordon v. Gordon,* 174 Md.App. 583, 923 A.2d 149 (2007), the husband contended that his ex-wife had voluntarily impoverished herself when she left a job paying $120,000 a year and

ended up in a job paying $25,000 a year. After considering all of the required factors in a case involving the amount of a child support award, the trial judge ruled that the ex-wife had not voluntarily impoverished herself. This Court affirmed that decision of the trial judge as one that was not an abuse of discretion and was not based on clearly erroneous fact-finding. Because of that procedural posture, an affirmance of the trial judge, the opinion is of limited support for our present decision to reverse the trial court. Judge Hollander's opinion, 174 Md.App. at 646, 923 A.2d 149, is nonetheless of value in describing the types of factors that are worthy of consideration when assessing the issue of voluntary impoverishment.

> The court looked at "the entire context" and did not quarrel with appellee's decision to leave her employment with AON. As for her other jobs, *the court determined that appellee made legitimate choices under the circumstances.* It recognized that appellee's income was significantly less than her level of income before David was born. Yet, *the court did not view appellee's decision to leave her position with AON as being "done for purposes of this litigation...."* Rather, *the court saw appellee's decision "as a career move,* and it may be that there were other motivations other than the best career move, or the best monetary career move, for her, but I don't think [that] amounts to voluntary impoverishment."

(Emphasis supplied).

We hold that it was error to rule that the Mother in this case had voluntarily impoverished herself. To rule that she was voluntarily impoverished for nine months of the year but not for the other three months, moreover, was double error.

### Imputation of Potential Income and Graduate School Stipends

Because, as we now hold, there was no voluntary impoverishment, the whole issue of imputing potential income to the Mother for nine months of the year is moot. Even were we to assume, however, purely *arguendo,* 1) that the child support year could be broken into chunks of nine and three months

respectively and 2) that the Mother had voluntarily impoverished herself for a nine-month segment of that year, we would still remand the case for a recalculation of child support based on a clear error in imputing to the Mother $2,000 a month of potential income.

The potential monthly income figure that was imputed to the Mother was based exclusively upon the stipend she had received a year or two earlier while still a graduate student at Johns Hopkins. A graduate student's stipend, however, is no measure of the individual's then present marketability in the labor force. It is not a history of what one is paid for a work product. A stipend is a form of student aid. The student, to be sure, may perform some tasks such as serving as a teaching instructor or performing certain laboratory work, but such tasks are confined to the student's area of study and are aimed at enhancing the total learning experience. If the student were to drop out of the degree program, the stipend would end. The stipend is not calculated to reflect the market value of the student's work product to the institution dispensing the stipend. The amount of the stipend is simply not an acceptable measure of earning potential.

### The Child Care Battle—A Draw

Although ranging over a broad swath of child support law, this entire battle between Mother and Father has been waged over the limited issue of who was going to pay what percentage of the cost of child care. The Mother sought to have the Father pay a share of the cost of child care while she attended the University of Virginia Law School. She lost in that regard. The Father, for his part, sought to have his share of the cost of child care during the Mother's summer associateship reduced, through a roundabout series of rulings, from about 52% to about 20%. He lost in that regard. Unless this very peripheral struggle is now encouraged to take on a life of its own, this controversy over the respective shares of responsibility for child care costs will, within a very few months, be history, even if not quite ancient history. It seems to us that that is where it belongs.

JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.