# CHUKWUDERA B. OKOLI *vs.* BLESSING N. OKOLI (No. 1).

### No. 10-P-1351.

### Suffolk. September 13, 2011. - March 6, 2012.

### Present: MILLS, SMITH, & WOLOHOJIAN, JJ.

*Divorce and Separation,* Child support. *Parent and Child,* Child support. *In Vitro Fertilization. Paternity. Legitimacy. Consent. Contract,* Duress. *Duress. Fraud.*

In a divorce action, the Probate and Family Court judge did not err in concluding that the husband was the legal father of children conceived through in vitro fertilization, where the husband gave consent for the artificial insemination of the wife within the meaning of G. L. c. 46, § 4B, in that he consented to create a child, even though he did not intend to be legally responsible for any child so created [373-377]; further, there was no merit to the husband's claims that he gave his consent under duress [378] or that his consent was obtained via fraud [378-379].

In a divorce action, the Probate and Family Court judge did not abuse her discretion in determining the amount of child support. [379-380]

COMPLAINT for divorce filed in the Suffolk Division of the Probate and Family Court Department on October 30, 2006.

The case was heard by *E. Chouteau Levine,* J.

*Dana Alan Curhan* for Chukwudera B. Okoli.

*Collins L. Akukwe* for Blessing N. Okoli.

MILLS, J. In a judgment of divorce dated August 27, 2009, a judge of the Probate and Family Court ordered Chukwudera B. Okoli (husband) to pay child support for the twin minor children of his marriage to Blessing N. Okoli (wife). The twins, born May 12, 2003, were conceived through in vitro fertilization (IVF) using donor sperm and donor eggs, and the probate judge ruled that the husband was the legal father of the children because he consented to the artificial insemination of his wife.[1] On appeal, he challenges the order for support and its amount. We affirm.

---

[1] "Any child born to a married woman as a result of artificial insemination with the consent of her husband, shall be considered the legitimate child of

*Facts.* The following facts, found by the probate judge, are supported by the record. The parties were married in Boston on October 4, 1991, and separated in November of 2000.[2] They had unsuccessfully attempted to have children since 1992 through a variety of means. When they separated, they were on a waiting list for donor eggs to pair with donor sperm for another attempt at IVF. Around November, 2001, donor eggs became available, and the wife sought the husband's consent for Boston IVF, Inc., a fertility clinic, to begin the IVF process. The husband balked initially, and the wife asked Amad Onujiogu, a family friend, to intercede.[3]

With Mr. Onujiogu's assistance, the parties signed a written agreement on December 20, 2001 (2001 agreement), providing in relevant part:

> "That [the husband] hereby gives his consent for [the wife's] fertility treatment[,] [e]mbryo freezing and disposition of eggs, sperm and embryo[.]
>
> "That [the husband] will recognize any offspring from this exercise as previously and mutually agreed to by both parties.
>
> "That since the financial assets of the family [have] been shared, [the husband] does not have any financial obligations with regards to the above exercise and [its] results[.]

the mother and such husband." G. L. c. 46, § 4B, inserted by St. 1981, c. 684, § 7.

[2] The judge found that when the parties separated, they agreed to the following property division:

> "33. The Wife received 25 Hosmer Street, with net equity of $690,000 or more, a bank account worth about $15,000, and her IRAs worth $27,280 for a total of $732,280.
>
> "34. The Husband received 7 Moraine Street, with a net equity of about $125,000, the investment in Nigeria of $15,000, his IRAs worth $32,699 and the $65,000 stock account for a total of $237,699."

The judge found that this division was fair and reasonable when negotiated, and fair and reasonable at the time of the divorce. Neither party challenges the property division on appeal.

[3] Amad Onujiogu was described by the judge as "a family friend, an elder member of the Nigerian community." Onujiogu also mediated the parties' initial separation and property division agreement.

> "That [the wife] will not at any time ask or sue for any
> other financial obligation regarding the above exercise and
> [its] results."

The judge found that the husband consented to the wife's IVF
procedure conditioned on these terms.

The judge also found that the husband agreed to execute the
2001 agreement in exchange for the wife's continued support of
his citizenship application.[4] When the marriage began to dete-
riorate,

> "the Wife used her sponsorship of the Husband's citizen-
> ship application as a lever to get what she wanted from
> him. She consistently threatened him that if he refused to
> do what she wanted, she would withdraw her support of
> his application. The Husband wanted to become a US
> citizen and did not want her to withdraw her support, so
> when he could he acquiesced to the Wife's requests."

Even though the 2001 agreement contained no written reference
to the citizenship application, the judge found that "[i]n exchange
for the Wife's continued support of his 'green card' application,
the Husband agreed that he would provide written consents for
the Wife's fertility treatments." The wife then underwent several
unsuccessful IVF treatments at Boston IVF. Each time, a new
consent from the husband was required. On many of the forms,
he added a notation that he was signing pursuant to the parties'
2001 agreement. On November 13, 2002, he signed the final con-
sent form for the procedure that resulted in a viable pregnancy
and the birth of the twins.

*Discussion.* On appeal, the husband makes three arguments
as to why he should not be ordered to pay child support on
behalf of the twins. First, he argues that he consented to the
wife's IVF procedure subject to the terms of the 2001 agree-
ment, and such conditional consent could not meet the consent

---

[4]In their trial and appellate papers, the parties continually refer to this as a
"green card" application. The judge, however, found that the husband had a
green card at the times relevant to this dispute. The wife had become a
naturalized citizen, and he was seeking citizenship with her sponsorship. It is
this sponsorship of the husband's citizenship application to which the parties
seem to refer when they describe his " 'green card' application."

standard of G. L. c. 46, § 4B. The judge rejected this argument without explanation, simply concluding that "[t]he Husband gave his consent to the impregnation of the Wife," thus establishing paternity under the statute.[5] Second, the husband argues that his consent was voidable because it was given under duress. He argues that he consented only because the wife threatened to withdraw her support for his "green card" application. The transcript indicates that the husband did not focus on this legal argument during trial, and the judge did not address duress in her memorandum and order.[6] Third, the husband argues that his signature on the final consent form was forged. In addition to these arguments, the husband argues that even if he is liable for child support, the judge miscalculated the wife's income, and therefore, the amount of support should be decreased.

1. *Consent under G. L. c. 46, § 4B.* We must consider the meaning of the term "consent" within G. L. c. 46, § 4B. The statute provides that "[a]ny child born to a married woman as a result of artificial insemination with the consent of her husband, shall be considered the legitimate child of the mother and such husband." The husband argues that he gave consent subject to his intent and understanding that he would not be legally responsible for any resulting child, and that such limited consent is not sufficient to establish his parental status under the statute. We have consulted Massachusetts cases as well as those from other jurisdictions, and we hold that consent for purposes of the statute means consent to create a child, rather than consent to become a parent.[7]

In *T.F.* v. *B.L.*, 442 Mass. 522, 532 (2004), the court declined to enforce an implied agreement between an unmarried same-sex couple that both individuals would be responsible for and parents of a child conceived through artificial insemination. The

---

[5]The husband also argues that G. L. c. 46, § 4B, does not apply to him because he was separated from the wife at the time and therefore was not her husband. A separation, however, "does not sever the marital relationship." *Campagna* v. *Campagna*, 337 Mass. 599, 605 (1958).

[6]The judge did find that the husband ultimately obtained citizenship on his own merits, after the wife withdrew her sponsorship (without informing him).

[7]As discussed *infra*, our survey of case law in other jurisdictions demonstrates that this distinction is routinely drawn when evaluating consent under other States' artificial insemination statutes.

court specifically noted the absence of legislation recognizing such an agreement. *Ibid.* In explanation, the court stated that "[t]he Legislature has identified those persons who are liable as parents to support their children" and cited, inter alia, G. L. c. 46, § 4B. *Ibid.* The court summarized c. 46, § 4B, as establishing that "if the spouse of a woman who undergoes artificial insemination consents to the procedure, that spouse is considered the legitimate parent of a resulting child." *Ibid.* The court thereby cast the statutory language, which expressly determines the status of the child, in terms of the equivalent proposition determining the status of the parents. While dicta in that case, we note the court's plain statement that, for purposes of the Massachusetts artificial insemination statute, simple consent to the procedure is enough to confer parental status.

Further, the court in *T.F.* v. *B.L.* held the couple's parenthood agreement invalid because "[t]he decision to become, or not to become, a parent is a personal right of 'such delicate and intimate character that direct enforcement . . . by any process of the court should never be attempted.' " *Id.* at 529–530, citing *A.Z.* v. *B.Z.*, 431 Mass. 150, 162 (2000). Likewise, in *A.Z.* v. *B.Z.*, *supra*, the court stated that "prior agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions." In that case, the husband had consented to the IVF procedure that resulted in the birth of twins, but he objected four years later when, following the couple's divorce, his former wife sought to implant the remaining frozen preembryos. The court held that his prior agreement could not be used to force procreation upon him against his will.

We read these cases to instruct that Massachusetts courts should not inquire into a person's subjective intent to become a parent when determining parental status. Such inquiry would be inherently problematic due to its "delicate and intimate character" and obvious evidentiary concerns. See *T.F.* v. *B.L.*, 442 Mass. at 529–530. In this light, we cannot interpret "consent" as used in G. L. c. 46, § 4B, to require an affirmative intent on behalf of the husband to be a parent. Mindful of the court's dicta in *T.F.* v. *B.L.*, *supra*, consent within the statute must therefore mean, simply, consent to create the child.

Cases from other jurisdictions are persuasive. *Laura WW.* v. *Peter WW.*, 51 A.D.3d 211 (N.Y. 2008), provides a succinct statement on the issue. "Indeed, 'if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law.' " *Id.* at 215, quoting from *Parentage of M.J.*, 203 Ill. 2d 526, 541 (2003). This statement equates the volitional act of sexual intercourse with the volitional act of providing a signature to consent to the artificial insemination or embryo implantation. In both cases, the intent of the putative father toward parental status plays no role. His volitional actions resulted in the creation of a child, and the law will attach parental responsibilities as a result.[8]

Lack of consent was also at issue in *Alexandria S.* v. *Pacific Fertility Med. Center*, 55 Cal. App. 4th 110, 113-114 (1997). There, in contrast to the facts here, the husband signed a consent form but, through the deception of his wife, believed it to be a simple waiver form for any problems related to the artificial insemination procedure. He had no intent to be the father of the child, and therefore did not adequately consent under California's version of the artificial insemination statute.[9] Likewise, in *Marriage of Witbeck-Wildhagen*, 281 Ill. App. 3d 502, 506-507 (1996), the husband expressly refused to consent to the artificial insemination procedure, and when the wife proceeded without his knowledge, the court found no parental status for the husband. These cases further support the conclusion that

[8]The argument may be even stronger than formulated by the court in *Laura WW.* v. *Peter WW.*, *supra*. When engaging in sexual intercourse, a male may have no belief at all that his actions will result in the creation of a child, yet in cases of unintentional pregnancy the male participant is still held responsible for child support. See G. L. c. 209C, § 1, as inserted by St. 1986, c. 310, § 16 ("Every person is responsible for the support of his child born out of wedlock . . ."). Artificial insemination or IVF has no purpose except to create a child, so the intent of the husband that a child will be created strongly supports parental responsibility.

[9]"If, under the supervision of a licensed physician and surgeon and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived." *Alexandria S.* v. *Pacific Fertility Med. Center*, *supra* at 115, quoting from Cal. Fam. Code § 7613(a).

the critical element of consent in cases of artificial insemination is consent to create a child. Thus, where a husband consents to an artificial insemination or IVF procedure, knowing that a child may result, parental status should attach.

The plain language of G. L. c. 46, § 4B, also supports an interpretation of consent that requires only intent to create a child. When construing a statute, "the statutory language itself is the principal source of insight into the legislative purpose." *Commonwealth* v. *Smith*, 431 Mass. 417, 421 (2000), quoting from *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580, 585 (1981). We may not "read into the statute a provision which the Legislature did not see fit to put there, whether the omission came from inadvertence or of set purpose." *King* v. *Viscoloid Co.*, 219 Mass. 420, 425 (1914). Chapter 46, § 4B, only mentions consent to the artificial insemination, not consent to assume any parental responsibilities. In strong contrast, the District of Columbia IVF statute, for example, provides that "[a] person who consents to the artificial insemination of a woman . . . *with the intent to be the parent of her child,* is conclusively established as a parent of the resulting child" (emphasis added). D.C. Code, 2001 Ed., § 16-909(e)(1) (Supp. 2011).

Given a choice between consent to create a child and consent to become a parent, we conclude that consent to create a child is the standard intended by the Legislature in G. L. c. 46, § 4B. We conclude that this is the approach most closely supported by the decisions of our courts, the logic of cases from other jurisdictions with analogous statutes, the specific statutory language, and the public policy underlying the statute, which looks principally to the interests of the child. In this case, the judge found that the husband signed the consent forms knowing the anticipated result of the procedure was the conception of a child. The statutory requirement of consent under G. L. c. 46, § 4B, was therefore met.[10]

---

[10]Concluding that the husband is the legal parent of the twins based on his consent under the statute, we note, as did the judge below, that it is axiomatic under Massachusetts law that "[p]arents may not bargain away the rights of their children to support from either one of them." *Knox* v. *Remick,* 371 Mass. 433, 437 (1976). See *White* v. *Laingor,* 434 Mass. 64, 66 (2001); *Adoption of Mariano,* 77 Mass. App. Ct. 656, 664 (2010).

2. *Defenses to consent.* Because the Legislature adopted the term "consent" in G. L. c. 46, § 4B, we read the plain language of the statute to incorporate the traditional consent defenses. See *King* v. *Viscoloid Co.,* 219 Mass. at 425.[11] The husband's consent to the procedure is presumed from his signature. See *Barletta* v. *New York, N.H. & H.R.R. Co.,* 297 Mass. 275, 277 (1937) ("The signature of [claimant] to a document . . . was prima facie evidence that the entire document was his act"); *First Safety Fund Natl. Bank* v. *Friel,* 23 Mass. App. Ct. 583, 584-585 (1987) (signature on loan instrument indicates indorsement); *Benson* v. *Massachusetts Gen. Hosp.,* 49 Mass. App. Ct. 530, 531-533 (2000) (patient had burden to disprove consent where his signature was on informed consent forms). He has the ability, however, to raise the traditional defenses to consent: fraud, mistake, or duress. See Restatement (Second) of Contracts § 7 comment b (1981). Here, the husband argues both duress and fraud.

a. *Duress.* We decline to address the husband's duress argument because it has not been properly briefed. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). The husband fails to outline the legal standard for duress and provides insufficient factual predicate to assist in the evaluation of his claim. The husband states that the wife used his citizenship application as leverage but presents no facts concerning the nature of his application or its review, and what effect the wife's withdrawal of support might have had. Finally, both parties repeatedly refer to the citizenship application as a "green card" application, which is simply inaccurate. "The plaintiff's brief fails to satisfy the duty implicit in the rules 'to assist the court with argument and appropriate citation of authority.' " *Bruno* v. *Seymoure,* 1 Mass. App. Ct. 857, 857 (1973), quoting from *Lolos* v. *Berlin,* 338 Mass. 10, 14 (1958).[12]

b. *Fraud.* The husband's first claim of fraud was that the

---

[11]As one possible alternative, the Legislature could have required a heightened "informed consent," requiring a duty to disclose on the part of medical personnel. *Vasa* v. *Compass Med., P.C.,* 456 Mass. 175, 177-178 (2010).

[12]Even if we were to consider the duress argument, we would not be persuaded. The citizenship support was only tangential to the consent agreement. Also, the husband ultimately obtained citizenship without his wife's support, suggesting that her lack of support was not completely preclusive. These

wife forged his signature, and he presented expert testimony to this effect. The judge did not credit the testimony. "Credibility determinations . . . lie exclusively within the province of the fact finder . . . who is free to believe one witness and disbelieve another." *Palmer* v. *Murphy*, 42 Mass. App. Ct. 334, 343 (1997). We will not disturb the judge's finding that the expert's testimony was not credible.[13]

The husband also argued that the wife fraudulently induced his consent by promising to support his "green card" application. The judge found these arguments "wasteful" and did not address them in her decision. The husband has not offered any legal arguments or facts that would convince us that the judge's finding was incorrect. The husband has therefore failed to properly brief this argument as well. See *Bruno* v. *Seymoure*, *supra* at 857.[14]

3. *Child support amount.* The husband challenges the level of income attributed to the wife from her rental property. We find no clear error in the judge's calculation of this income. The judge, within her discretion, relied upon the wife's Federal tax returns for the previous three years in estimating her income

---

circumstances distinguish this case from the closest analogs of noneconomic duress in a divorce context. Cf. *Charara* v. *Yatim*, 78 Mass. App. Ct. 325, 337-338 (2010) (holding that wife's agreement to waive custody given under duress, because husband and wife were Shia Muslims, and she knew that religion precluded her from retaining custody in divorce). See *Segal* v. *Segal*, 278 N.J. Super. 218, 225 (1994) (holding that wife signed divorce agreement under duress where couple was Jewish and husband had complete control to grant or refuse religious divorce); *Golding* v. *Golding*, 176 A.D.2d 20, 22-23 (N.Y. 1992) (same). In these cases, agreements were invalidated due to duress only where one party held absolute and preclusive control over an essential element of the divorce.

[13]Additionally, the trier of fact can determine the authenticity of a handwriting for herself when, as in this case, there are genuine specimens with which to compare it. See *Commonwealth* v. *O'Connell*, 438 Mass. 658, 662-663 (2003).

[14]Even if we were to consider the fraud argument, the husband's claim is not viable for the simple reason that there is no evidence in the record that would allow us to conclude that the wife lied when she offered to support his "green card" application in exchange for his signature on the consent form. The judge presumably found that this assertion lacked support or credibility when she described the argument as "wasteful," and the husband has offered no evidence demonstrating that the judge's finding was "clearly erroneous." *Kendall* v. *Selvaggio*, 413 Mass. 619, 620 (1992).

from the rental property. The judge then properly deducted the expenditures related to the property from the gross income, and calculated the net monthly income. No error is shown in the judge's determination of the amount of child support.

*Judgment affirmed.*