REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2616

September Term, 2013

_____

STEPHEN SIEGLEIN

v.

LAURA SCHMIDT

_____

Zarnoch,
Graeff,
Leahy,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: August 25, 2015

Appellant Stephen Sieglein ("Father") and Appellee Laura Schmidt ("Mother") were married in a religious ceremony in Havre de Grace, Maryland on April 12, 2008. Two years later, both parties enrolled in an "in vitro" fertilization plan and signed the contracts and documents necessary to participate. A child conceived via donated egg and donated sperm was born to the parties.

The parties separated shortly after the birth of the child, and Father contested legal parentage, seeking to eschew any rights or obligations regarding the minor child. On October 11, 2012, the Circuit Court for Harford County issued a Memorandum Opinion and Order establishing legal paternity and Father's joint and several responsibility for support of the minor child. Following a temporary order as to child support, visitation, and custody, the circuit court entered a Judgment of Absolute Divorce on June 19, 2013. On February 10, 2014, the circuit court issued an order finding Father to be voluntarily impoverished, ordering the payment of child support and arrearages, and granting Mother's request for injunctive relief in the form of a protective order. Father now entreats this Court to declare, *inter alia*, that because the child is "not the natural child of the parties, nor is he the adopted child of the parties[ but] . . . was conceived in[]vitro . . . through the employment of [anonymously] donated eggs and donated sperm," he is not a parent and bears no legal responsibility for the child under Maryland law.

Father presents the following questions for our review, which we have reordered:

1

I.    Did the Court below err in ruling that Appellant was the parent of a child conceived through 'in vitro' fertilization with a donated egg and donated sperm?

II.   Did the Court err and/or abuse her discretion in granting an Injunction against Appellant?

III.  Did the Court err and/or abuse her discretion in finding that Appellant was "voluntarily impoverished"?

Because Mother and Father, during their marriage, willingly and voluntarily agreed to conceive a child through assisted reproductive services using anonymously donated genetic material and that volitional action resulted in the birth of a child, we hold that Maryland Code (1974, 2011 Repl. Vol.), Estates and Trusts Article ("ET") § 1-206(b) applies to establish that both spouses are the legal parents of the minor child.   Therefore, both spouses are "jointly and severally responsible for the child's support, care, nurture, welfare, and education." Maryland Code (1984, 2012 Repl. Vol.), Family Law Article ("FL") § 5-203.   Additionally, we conclude that the circuit court did not abuse its discretion in issuing an injunction against Father, or in finding Father to be voluntarily impoverished.

## BACKGROUND

The majority of the facts in this case are undisputed.   Prior to their first meeting, both parties had children from past relationships,[1] and sometime after the birth of his first

---

[1] Father's child from a previous marriage had reached the age of majority and did not reside with the parties.   Mother's child from a previous relationship was still a minor (continued . . .)

child, Father underwent a vasectomy. Thereafter, the parties met through an online dating site. As Father emphasizes, his online dating profile stated: "[w]ant kids: No." Notwithstanding, the parties began a relationship and were married in April of 2008.

Following their marriage, Mother expressed a desire to have another child. She was unable to conceive, however, and Father, after some discussion and evaluation, declined to have his vasectomy reversed. Mother and Father sought assisted reproductive services from Shady Grove Fertility Reproductive Science Center including: in vitro fertilization, intracytoplasmic sperm injection, assisted hatching, and embryo freezing. The consent acknowledgment form required by Shady Grove Fertility Reproductive Science Center provided, in pertinent parts:

> I/We have been fully advised of the purpose, risks and benefits of each of the procedures indicated above, as well as Assisted Reproduction generally, and have been informed of the available alternatives and risks and benefits of such alternatives. This information has been supplemented by my/our consultation with my/our medical team. I/We have had the opportunity to ask questions and all my/our questions have been answered to my/our satisfaction.
>
> I/We have read the Assisted Reproduction document in its entirety and have had ample time to reach my/our decision, free from pressure and coercion, and agree to proceed with my/our participation in Assisted Reproduction services as stated above.

The acknowledgment was signed by both Mother and Father and witnessed on January 20, 2010. Thereafter, Mother and Father participated in the assisted reproductive care

and resided with the parties during the marriage.

3

program.

The parties opted to pursue 'In Vitro' Fertilization ("IVF")[2] and it was through this method that a child was conceived and born of the marriage of Mother and Father on March 25, 2012. It is uncontested that both parties enrolled in the program and signed the necessary contracts and documents in the first two months of 2010.[3] Both Mother and Father appear on the birth certificate.[4] Both parents participated in the care of the minor child immediately following birth.

Only one month after their child was born, Mother and Father separated. On May 3, 2012, Mother filed a complaint for limited divorce in the circuit court asserting the

---

[2] IVF, "in its simplest form, involves hormonal monitoring and stimulation of the woman producing ova, harvesting the ova, mixing them with sperm in a petri dish containing a culture medium, waiting for approximately three days for embryo development, and then transferring one or more embryos, back to the woman." Lyria Bennett Moses, *Understanding Legal Responses to Technological Change: The Example of in Vitro Fertilization*, 6 Minn. J.L. Sci. & Tech. 505, 510 (2005). Precise techniques vary; however, as in the present case, an infertile couple may rely on the use of both donated sperm and donated ova to produce a fertilized embryo for transfer to the infertile woman's uterus. Keith Alan Byers, *Infertility and in Vitro Fertilization A Growing Need for Consumer-Oriented Regulation of the in Vitro Fertilization Industry*, 18 J. Legal Med. 265, 274 (1997).

[3] The circuit court's Memorandum Opinion indicates that the parties signed the necessary contracts and documents on February 25, 2010. Although neither party disputes this date, we note only for exactness that the record contains documents regarding Assisted Reproductive services that were executed by the Mother and Father on January 20, 2010. Some of those forms were later signed by a physician on or about February 18, 2010.

[4] The certificate of live birth for the minor child was issued on July 25, 2012.

grounds of "Cruelty/Excessively Vicious Conduct Against Me," "Cruelty/Excessively Vicious Conduct Against My Children," and voluntary separation. Soon thereafter, Mother filed a petition for child support, and Father filed his answer on June 12, 2012, denying parentage of the minor child.

On July 11, 2012, the circuit court held a pre-trial conference and set a hearing date of August 31, 2012, to address the issue of paternity. On July 23, 2012, Father filed a motion for determination of a question of law pursuant to Maryland Rule 2-502, requesting that the circuit court decide "whether or not [Father] is a 'parent' as that term is employed and understood under Maryland law, so as to obligate him under [Mother's] claim for child support."

On August 13, 2012, a hearing was held to address Mother's petition for child support and Father's motion for determination of the legal question regarding parentage. Father argued that the Court of Appeals "has separated the obligation of support from the question of [] legitimacy [in] the Estates and Trusts Article[, and] the test that the Court of Appeals applies is genetics." Father contended that, if he is not a "parent" to the minor child under Maryland law, then the court cannot impose a child support obligation upon him. Nevertheless, Father's counsel acknowledged the problems inherent in the argument, stating:

> [I]t is an interesting part of the discussion because you have to recognize that what I am asking you to do is to rule that this child has no natural parents because we didn't know who the anonymous donors are. That's a byproduct of the in[]vitro process and that's why it's a question of legislative intent.

5

Mother countered that Father is the legal parent of the minor child and is responsible for support of that child pursuant to ET § 1-206(b), which provides: "*A child conceived by artificial insemination of a married woman with the consent of her husband is the legitimate child of both of them for all purposes.*" (Emphasis added).

On October 11, 2012, the circuit court (William O. Carr, J.), filed its memorandum opinion and order establishing Father's legal paternity and responsibility for support. The court found:

> [T]he Estates and Trusts Article unequivocally states that a child conceived via the artificial insemination of a married woman with the consent of her husband is the legitimate child of both spouses.
>
> * * *
>
> [Father] married [Mother] in 2008. When [Mother] expressed a desire to have a child, [Father] accompanied her to a fertility clinic to explore the IVF process, and they both signed the consent forms for the IVF treatment. [Father] remained in the marital home with [Mother] throughout the pregnancy, and his name appears on the child's birth certificate as the father.
>
> * * *
>
> [T]he genetic paternity of the child is not in dispute, and no blood tests are needed to determine who the father of the child is. Instead, *the presumption in § 1-206(b) is that [Father] consented to the artificial insemination process, making the child the legitimate child of [Father]. This presumption is not overcome by applying the Best Interests of the Child standard. . . . [Father] jointly engaged in efforts with [Mother] to create a child, and it is in the best interest of the child to receive support and care from both parents.*

(Emphasis added).

6

The parties next appeared in the circuit court before Judge Angela M. Eaves on December 17, 2012, for a hearing on the *pendente lite* establishment of custody and child support. On the same day just before the hearing, Mother filed an amended complaint for limited divorce seeking sole legal and physical custody of the minor child, child support, and injunctive relief pursuant to FL § 1-203(a)(2).[5] In support of the amended complaint, Mother cited to a then existing Final Protective Order issued by the District Court for Harford County requiring Father to vacate the home and stay away from Mother, contending Father constructively deserted her by causing her to flee the marriage in order to preserve her health, dignity, safety and welfare.

At the hearing on December 17, Father maintained that he did not recognize the minor child as his child and was not seeking custody or visitation. Declining to revisit the issue of legal paternity, the circuit court found that Father—who, as discussed in detail *infra,* was currently unemployed—had voluntarily impoverished himself, and the court addressed the proper amount of child support based on imputed income. The circuit court stated:

---

[5] FL § 1-203(a) provides:

(a) In an action for alimony, annulment, or divorce, an equity court:
   (1) has all the powers of a court of equity; and
   (2) may issue an injunction to protect any party to the action from physical harm or harassment.

7

> I am making a finding that [Father] is voluntarily impoverished, first stating that he is not going to support [the minor child] in any way; second, from then having other assets and resources at his disposal that he has chosen to use only for his benefit, but not necessarily even in a way that's financially prudent.

Based on its findings, the circuit court entered a temporary order as to child support on January 8, 2013. The temporary order, among other things, granted sole physical and legal custody to Mother, and ordered Father to pay child support in accordance with the Maryland guidelines and payment of arrearages in the amount of $7,171.00.

On May 22, 2013, the parties went to trial solely on the issue of divorce. The circuit court noted at the outset that there were no further issues regarding property and no claim for alimony. Remaining issues regarding parentage, support, and injunctive relief were reserved for a subsequent hearing.[6] After limited testimony from Mother and

---

[6] On June 14, 2013, the circuit court issued an order clarifying the remaining issues, which stated:

1. The Defendant denies and wishes to contest that he should be found the father of the minor child, (d/o/b 3/25/12). 2. The Defendant in this case specifically waives any claim or request for custody or visitation with the minor child. 3. The Defendant also contests that he has any responsibility to pay any child support and, even if he is ultimately found by this court to be the father of the minor child, that he does not have the income or resources to pay child support. 4. In the event that this court finds that the Defendant is in fact the father of the minor child, Plaintiff seeks to pursue a position that the defendant should be considered voluntarily impoverished. 5. At a later time, the Plaintiff wishes to pursue as additional relief, Orders from this court that the Defendant have no contact with her and that he be ordered not to engage in any harassing conduct.

another witness, the circuit court entered an order granting absolute divorce on June 19, 2013.[7]

The circuit court hearing from which this appeal was taken was held on February 5, 2014. Again, Father requested that the court revisit the issue of legal parentage, but the court refused stating: "[t]hat has already been adjudicated . . . with an order back in the fall of 2012 and no one has appealed from that order."

Although Father was employed again by the time of the hearing, he continued to dispute the court's finding of voluntary impoverishment in its temporary order issued January 8, 2013. The court refused to revisit the previous finding of voluntary impoverishment but determined to rule on the issue prospectively. Father, a college graduate and long-time employee of Sysco Food Services as a marketing and sales associate earning approximately $49,000.00 per year (partially based on commission),[8] testified that he was unemployed from mid-November 2012 until he accepted a position as a route sales driver for Schwan Home Food Service on December 16, 2013. Father admitted that during his period of unemployment he received unemployment benefits and

---

[7] The order of absolute divorce was filed on May 28, 2013, but was not entered on the docket for several weeks.

[8] Father's 2011 W-2 from Sysco Food Services reflected income in the amount of $49,187.00. His 2012 W-2 from Sysco reflected year-to-date income in the amount of $36,470.87 at the time of his October 5 resignation. At the December 17, 2013, hearing, Father testified that the difference in income was a result of his 2011 income being based on salary plus commission, while his 2012 income was commission only.

income from a rental property he owns.

Father also presented the circuit court with copies of his completed "Work Search Contacts" forms logging his efforts to obtain employment while receiving unemployment benefits. On cross-examination, however, Father admitted to making only 90 employment contacts during his extended period of unemployment, some of them repetitive. When questioned as to why he had not made more contacts or submitted more applications, Father responded, "[b]ecause I was just working the way that I wanted to work my unemployment." Further, Father acknowledged that, for eight days he had a position as a trainee with Business Machines, but according to a document from Business Machines, his position was terminated after Father requested that they enter a later start date for him so that he could continue to be certified for unemployment. Father does not dispute that he made the request, but maintains that he did so because he was not guaranteed any income during his training period.

Regarding Mother's request that the circuit court grant injunctive relief to protect Mother from physical harm or harassment by Father, Mother testified as follows:

> [Father] has approached me on multiple occasions. In August he would circle around me at church. I stopped going to church for a while. I went back to church and then I went to two separate events, one in October . . . outside. [Father] circled around my daughter and I and another friend 10-15 times within arm's reach. First he was doing it behind me so I couldn't see him . . . [a]nd then he circled around.

\* \* \*

[I]n November, we were at a missions event in church and [Father] saw that

10

we were there. . . . He came into line right behind me and I said "Stephen, leave." I said it firmly. And he just looked at me and smiled. Then I said, "you need to leave." And then he laughed and finally left.

* * *

His physical proximity, size, his closeness to me are a threat. That is upsetting and intimidating and I don't want to be that close to him. I don't want him coming within arm's reach of me.

* * *

I feel like he approaches me and pushes it and then tries to intimidate.

Notably, Mother presented no objection to Father's continued attendance at the same church; when required she simply moves to the other side of the room.

At the conclusion of the hearing, the circuit court ruled on the record. With respect to child support, the circuit court considered numerous factors and found that Father had voluntarily impoverished himself through what the court termed "a pattern of . . . not wanting to pay child support for a child already determined to be his." Imputing an income consistent with Father's prior employment, the court calculated a child support obligation of $1,007.00 per month effective from November 1, 2013. Regarding the requested injunctive relief, the circuit court stated:

> [Father's] credibility suffers with this Court. The manner in which he testifies, his ability only to recall events favorable to him in this case and the fact that he is less than honest in his dealings with respect to [Mother]. . . . Circling around her when he knows that she is present. . . . There is a protective order in place. Getting in line behind her when you know it is her means that you walk away because there is a protective order in place. This court did not have to find, in extending the protective order, that there was a violation of that order. . . . But the Court extended the protective order for

11

good cause shown[.]

* * *

I do think that [Father] is playing fast and loose with the Court's order in this matter and accordingly, I'm going to order him to stay 75 yards away from [Mother] and the children and to have no contact.

The circuit court signed an order memorializing its oral rulings in the hearing on February 7, 2014 (entered on February 10, 2014).

On February 25, 2014, Father filed a timely Notice of Appeal from the orders of the circuit court dated October 11, 2012, May 13, 2013, June 14, 2013, and February 7, 2014.

We include additional facts in the discussion relevant to the issues there examined.

## DISCUSSION

As a preliminary matter, we address Mother's contention that the circuit court's October 11, 2012, order establishing Father's legal paternity and responsibility for support was a final order from which Father should have noted a separate timely appeal. Under Maryland Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP") § 12-301 "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." "In determining whether a particular court order or ruling is appealable as a final judgment, we assess whether any further order was to be issued or whether any further action was to be taken in the case." *In re Katerine L.*, 220 Md. App. 426, 437 (2014) (citing *In re Samone H.*, 385 Md. at 298). It is beyond doubt that the circuit court's rulings regarding legal parentage and the obligation to provide support were part-and-parcel with

12

the further action required in this divorce and child support case. Accordingly, the October 11, 2012, order lacks that requisite character of finality.

Father's "Motion for Determination of Question of Law" was filed pursuant to Maryland Rule 2-502, which provides, in pertinent part:

> If at any stage of an action a question arises that is within the sole province of the court to decide . . . and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient.

This rule differs from summary judgment in that it is not intended as a device for dismissing cases. *Harris v. Stefanowicz Corp.*, 26 Md. App. 213, 218-19 (1975). "Properly invoked, the rule unquestionably enables a [court] to decide a purely legal issue as a preliminary matter[, and] [i]n the usual case, application of the rule will result in a bifurcated proceeding, where resolution of certain legal questions precedes resolution of issues which must be tried." *Id.* at 220. We have acknowledged that the application of Rule 2-502 may, in some cases, conclude the case, *id.*, and, where the resulting order is in the nature of a final decree, an appeal may lie from that order, *see, e.g.*, *Bender v. Schwartz*, 172 Md. App. 648 (2007) (reviewing de novo the circuit court's decision where, by agreement of the parties, the circuit court decided all the issues before this Court, not on a motion to dismiss, but under Maryland Rule 2-502, and dismissed the underlying complaint). However, a Rule 2-502 proceeding on an issue of law cannot normally be appealed until the conclusion of the entire litigation. *Harford Sands, Inc. v. Levitt & Sons,*

*Inc.*, 27 Md. App. 702, 709 (1975) (stating that an order which merely decides a legal issue in the case, "but does not decide the entire cause of action, is not a 'final judgment upon' a 'claim for relief,' and therefore an appeal from such an order will not lie").

Thus, at the time of Father's motion, both parties were aware that—whatever the decision of the circuit court on the legal question—further proceedings would be necessary for the resolution of the divorce complaint. Because the order of the court as to legal parentage was not dispositive of any claim for relief, no immediate appeal was required.

Although we note, without deciding, that an interlocutory appeal pursuant to CJP § 12-303(3)(x)[9] *may* have been an option for Father, Maryland Rule 8-131(d) provides:

> On an appeal from a final judgment, an interlocutory order previously entered in the action is open to review by the Court unless an appeal has previously been taken from that order and decided on the merits by the Court.

Thus, the circuit court's October 11, 2012, order is properly before this court on appeal following the circuit court's final judgment in the divorce, custody, and support case.

---

[9] CJP 12-303 provides, in pertinent part:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(3) An order:

\* \* \*

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]

14

## I.

## IVF and Legal Parentage

Father contends that the circuit court erroneously equated artificial insemination with IVF in applying ET § 1-206(b). Father argues that the two processes are physically and scientifically distinct, and, while there is a "historical understanding about the meaning of 'artificial insemination,'" the statute was passed at a time when IVF was not yet practiced. Mother counters that through the use of the term "artificial insemination," which was "at the forefront of reproductive technology" when the subsection (b) was added Section ET § 1-206, the General Assembly "contemplated the role of non-traditional conception of a child as it pertains to a parent's rights and obligations."

**Presumption of Legitimacy**

As a threshold matter, the question of paternity raised in this case is governed by the Estates and Trusts Article because the child was born during the marriage. *Turner v. Whisted*, 327 Md. 106, 113 (1992). ET § 1-206 creates a presumption of "legitimacy" for children born to a married mother.[10] *Evans v. Wilson*, 382 Md. 614, 624 (2004). In contrast, the Paternity Act, codified at Maryland Code (1984, 2012 Repl. Vol.), Family Law Article §§ 5-1001 *et seq.*, is aimed at addressing putative fathers in regard to children

---

[10] It is worth noting that, although the question of parentage in this case is not governed by the Family Law Article, FL § 5-1027(c)(1) also states: "[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

born *outside of marriage*. *Turner*, 327 Md. at 113 (citing *Stubbs v. Colandrea*, 154 Md. App. 673, 688 (2004)). The Court of Appeals has determined that when paternity is in question for a child born during a marriage, the Estates and Trusts Article applies "because it presents the 'more satisfactory' and 'less traumatic' means of establishing paternity." *Ashley v. Mattingly*, 176 Md. App. 38, 58 (2007) (quoting *Evans*, 382 Md. at 628).

Subsection (b) extends the presumption of legitimacy to "[a] child conceived by artificial insemination of a married woman with the consent of her husband." ET § 1-206(b). Subsection (b) was added in 1969, when the General Assembly repealed the "Testamentary Law" title and enacted the "Decedents Estates" title (then Maryland Code, Art. 93 § 1-206). 1969 Laws of Maryland ch. 3. The presumption created by ET § 1-206 is only set aside where the court has "weigh[ed] the various interests of the parties and, in particular, consider[ed] whether blood or genetic testing [to establish or disestablish parentage] would be in the best interests of [the child]." *Evans*, 382 Md. at 629.[11]

Here, Father attempts to rely on *In re Roberto d.B.*, 399 Md. 267 (2007), to assert that "this case is not to be governed by the best interests of the child standard," but rather, the test to be applied here is whether Father is genetically related to the minor child. *In re*

---

[11] In *Kamp v. Department of Human Services*, the Court of Appeals advocated a balanced approach reflective of "the court's paramount concern of protecting [the child's] best interests" when determining whether a blood or genetic test should be ordered upon a showing of good cause sufficient to overcome the statutory presumption. 410 Md. 645, 659-61 (2009) (quoting *Turner*, 327 Md. at 117).

*Roberto d.B.*, is not controlling, however, because in that case the Court of Appeals addressed the legal parentage of a child *born out-of-wedlock* in the context of the *Paternity Act* (FL §§ 5-1001 *et seq*.). 399 Md. at 279.

In *In re Roberto d.B.*, the appellee contracted to carry *in vitro* fertilized embryos to term as a genetically unrelated gestational host and gave birth to twins. 399 Md. at 270. Neither the appellee nor the appellant wanted the gestational carrier's name to be listed on the birth certificates as the "mother" of the children. *Id.* at 272. Nonetheless, the Maryland Division of Vital Records, having received information from the hospital regarding the births, listed the appellee as "mother." *Id.* at 271-72.

In the circuit court, the parties requested "an 'accurate' birth certificate, i.e., one that did not list the gestational carrier as the children's mother." *Id.* at 273. However, the circuit court denied that request. *Id.* On appeal, the parties' primary contention was that the paternity act, as enforced by the trial court, did not afford equal protection of the law to similarly situated men and women. *Id.* at 274. "The appellant contend[ed] that because Maryland's parentage statutes allow a man to deny paternity, and do not, currently, allow a woman to deny maternity, these statutes, unless interpreted differently, are subject to an [Equal Rights Amendment] challenge." *Id.* at 275. Applying Maryland's Equal Rights Amendment (E.R.A.), Article 46 of the Maryland Declaration of Rights, the Court of Appeals determined that paternity statutes must apply equally to both males and females, and the process by which males can challenge paternity can also be employed by females to

17

challenge maternity. *Id.* at 283.

In that case, presented with an unmarried, gestational surrogate, not genetically related to the children, the Court of Appeals determined that it must "constru[e] the parentage statutes [in the Family Law Article] in a way that affords women the same opportunity to deny parentage as men have." *Id.* at 279. *In Re Roberto d.B.*, did not, as Father contends, indicate that genetics is the sole standard for determining disputed parentage in Maryland. It merely extended to women the right to dispute parentage through genetic testing where that right already existed for men. *In Re Roberto d.B.*, is well-removed factually from the present case, and lends no support to Father's argument that the use of IVF, rather than artificial insemination is a legally significant distinction placing this case outside the bounds of ET § 1-206.

We note that, under Father's argument, any parent not genetically related to a child could disestablish parentage and, thereby, avoid any obligations of support. Clearly the equal rights analysis of *In Re Roberto d.B.* would have to extend to mandate that where Father may disestablish parentage presumed under ET § 1-206 for lack of a genetic link, so too might Mother. The result, here, would be a child with no legally responsible guardian and an automatic ward of the State. Furthermore, Father's reasoning, if accepted, could be extended to exclude a non-genetic parent in a marriage from establishing legal parentage of a child born in the marriage unless such a parent petitioned to adopt the child—a process not currently required or considered normal

18

practice. We determine that Father's interpretation, detrimental to the exercise of parental rights, was not intended by the General Assembly and is not recognized under Maryland case law.

**Artificial Insemination and IVF**

Addressing the use of assisted reproductive services and a donated egg, the Court of Appeals *In re Roberto d.B.* observed that "[t]he paternity statute, clearly, did not contemplate the many potential legal issues arising from these new technologies, issues that will continue to arise unless the laws are rewritten or construed in light of these new technologies." 399 Md. at 279. In contrast, ET § 1-206(b), which governs the legal parentage of a child born during a marriage, plainly does contemplate such technologies through its provision for children conceived via artificial insemination. The goal of any statutory interpretation analysis is to give effect to the legislative purpose or policy underlying the statute. *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006).

Under Father's interpretation of ET § 1-206(b), a child conceived via artificial insemination with donated sperm would be a legitimate child of the marriage, while a child conceived via IVF using the same genetic material would not. According to Father, "the essential aspect of the 'in vitro' process is that it occurs outside of the woman's body, whereas, as the name literally describes, 'artificial insemination' necessarily takes place within her body." Moreover, Father urges, IVF is a comparatively recent innovation,

adding that ET § 1-206(b) was codified in 1969 and the first IVF did not take place for another decade.

Despite Father's assertion that the processes of artificial insemination and IVF are "physically and scientifically distinct," it is clear that either process may be executed using donated genetic material. *See, e.g.*, *In re Roberto d.B.*, 399 Md. at 270 (artificial insemination of a donated egg); *L.F. v. Breit*, 736 S.E.2d 711, 715 (Va. 2013) (in vitro fertilization with donated sperm); *Okoli v. Okoli*, 963 N.E.2d 730, 731 (Mass. App. Ct. 2012) (in vitro fertilization using donor sperm and donor eggs). Artificial insemination and IVF are two of many procedures used today that change or substitute for human reproduction by sexual intercourse, and we are not called upon here to explore or explain any scientific, practical or ethical distinctions. By enacting ET § 1-206(b), the General Assembly evinced its intention to acknowledge the role of medically assisted, non-traditional conception of a child in establishing a parent's rights and obligations. Under Maryland law, within the context of marriage, the precise physical procedure has no necessary impact on the relationships of the parties involved—mother, father, and child. Therefore, we interpret ET § 1-206(b) as also encompassing IVF, and hold that a child conceived via artificial insemination or IVF with the consent of the parties and born during a marriage is the legitimate child of the marriage and legal parentage is established as to both spouses. In the matter before us, where Mother and Father were married at the time of conception and birth, and willingly and voluntarily agreed to conceive a child through

20

assisted reproductive services using anonymously donated genetic material, we hold that ET § 1-206(b) applies to establish the legal parentage of both Mother and Father.

Cases from other jurisdictions have also recognized that a party's consent to the conception of a child via assisted reproductive services gives rise to the obligations and rights of legal parentage. *See, e.g.*, *Okoli*, 963 N.E.2d at 734 (citing *Laura WW. v. Peter WW.*, 51 A.D.3d 211, 215 (N.Y. 2008)). In *Okoli*, the parties consented to conceive twins via IVF using donated eggs and donated sperm. *Id.* at 731. Like the Maryland statute, the applicable statute in *Okoli*, on its face, only contemplated artificial insemination, providing that "[a]ny child born to a married woman as a result of artificial insemination with the consent of her husband, shall be considered the legitimate child of the mother and such husband." Mass. Gen. Laws Ann. ch. 46, § 4B. Nonetheless, the court equated "the volitional act of sexual intercourse with the volitional act of providing a signature to consent to the artificial insemination or *embryo implantation*," and determined that where such "volitional action resulted in the creation of a child . . . the law will attach parental responsibility" pursuant to the statute. *Id.* at 734 (emphasis added).

In Maryland, the presumption of legal parentage established under ET § 1-206 may only be rebutted after a showing that proceedings to disestablish parentage are in the best interests of the child. *See Evans*, 382 Md. at 629. No argument has been made in this case that setting aside paternity is in the best interests of the child. Certainly, it defies sound public policy to create, through the strained application of a statute, a subset of

21

children who—based on the specific physical method of their conception—"ha[ve] no natural parents because we d[o]n't know who the anonymous donors are." As legal parent of the minor child, born during his marriage, Father is "jointly and severally responsible for the child's support, care, nurture, welfare, and education" under FL § 5-203.

## II.

### Injunction Pursuant to FL § 1-203

FL § 1-203 provides, in pertinent part:

(a) In an action for alimony, annulment, or divorce, an equity court:
    (1) has all the powers of a court of equity; and
    (2) may issue an injunction to protect any party to the action from
    physical harm or harassment.

Father contends that, even viewed in the light most favorable to Mother, the evidence adduced at trial failed to merit the grant of injunctive relief requested by Mother. Father maintains that Mother failed to make any allegations of physical harm and that her claims of harassment consisted of bare assertions. He also asserts that, given the lack of a durational limit on the injunction, "the Chancellor went too far on too little evidence[.]"

Mother cites *Magness v. Magness*, 79 Md. App. 668, 675, *cert. granted* 317 Md. 440, *appeal voluntarily dismissed by petitioner,* 317 Md. 641 (1989), and *Cote v. Cote*, 89 Md. App. 729, 739 (1992), in support of the authority of the circuit court to issue the protective injunctions in the present case. She argues that the primary goal of FL § 1-203(a)(2) is safety; therefore, where the previous protective order issued by the district court failed to deter Father, and she had truthfully and credibly testified that she felt

22

harassed, intimidated, and threatened (when, for example Father approached Mother and her daughter at an outdoor church event and "circled around [them] 10-15 times within arm's reach").

The February 10, 2014, order of the circuit court provides:

ORDERED that Plaintiff is hereby GRANTED the injunctive relief requested pursuant to [FL §] 1-203(a)(2); and it is further

ORDERED that Defendant shall not contact Plaintiff, in writing, verbally, telephonically, through any third party, or in any other manner, and is to remain 75 yards away from Plaintiff[.]

Notably, we are not addressing a typical interlocutory injunction to "preserve the status quo *during litigation.*" *Magness*, 79 Md. App. at 678 (emphasis added). However, the text of section 1-203 does not require that the injunction be interlocutory, nor does it directly prohibit the issuance of a permanent injunction. We look to *Magness* and *Cote,* as the circuit court did, in assessing the appropriate standards for issuing an injunction pursuant to FL § 1-203(a)(2).

In *Magness*, we stated that "[t]he decision to grant or deny an interlocutory injunction is within the sound discretion of the court." 79 Md. App. at 678. In deciding whether to exercise its discretion under section 1-203 the court first looks to whether there will be irreparable injury to the moving party if the injunction is not granted. *Cote*, 89 Md. App. at 735 (citing *Magness,* 79 Md. App. at 678). Regarding this first factor, in *Cote* we noted that "[t]he trial court in its holding determined that there was a risk of irreparable injury that could occur, namely, future physical abuse of and by both parties. This is the

23

element of irreparable injury required by *Magness*." *Id.* In the present case, the determination of the circuit court that there was a likelihood of future harassment, as contemplated in FL § 1-203(a)(2), supplies the element of irreparable injury.[12]

The second factor is that the issuance must not compromise the court's ability to grant complete relief in the divorce action. *Id.* However, Father does not address the second factor, and there is no indication in the record that a protective order keeping the parties separated had any effect on the final judgments of the circuit court because those judgments were rendered on the same day.

Turning to the evidence adduced in the matter now before us, although Mother did not testify to physical abuse, the circuit court found Mother's testimony regarding Father's harassing behavior to be credible. The circuit court found that Father was deliberately putting himself in Mother's proximity despite the existing protective order and with knowledge of Mother's subjective fear. The circuit court stated:

> I don't know how else to put this except that [Father] seems to believe that because he and [Mother] attend the same church, if he puts himself in her proximity the Court somehow will find that to be unintentional or accidental. . . . There is a protective order in place. . . . I do think [Father] is playing fast and loose with the Court's order in this matter.

---

[12] "Irreparable injury" has been defined as an injury "suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate." *El Bey v. Moorish Sci. Temple of Am., Inc.*, 362 Md. 339, 355 (2001) (citation omitted); *see also Dudley v. Hurst,* 67 Md. 44, 52 (1887) ("An injury may be said to be irreparable when it cannot be measured by any known pecuniary standard.").

24

The court also noted that Mother's fear was subjectively reasonable. In contrast to Mother's testimony, the court found that Father's testimony lacked credibility.

To determine that the circuit court abused its discretion we must find that it acted "'without reference to any guiding rules or principles,' or that 'no reasonable person would take the view adopted by the [circuit] court,' or that the decision of that court is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Michael Gerald D. v. Roseann B.*, 220 Md. App. 669, 686 (2014) (citations omitted). Here, we cannot say that the circuit court abused its discretion when it determined, based on the evidence before it and its credibility determinations, that an injunction aimed at preventing future harassment by Father and irreparable injury was appropriate in this case.

### III.

### Voluntary Impoverishment

Finally, Father contends that the circuit court erred in finding him to be voluntarily impoverished because, among other reasons, "the uncontradicted evidence [showed] that he had lost his long time employment in October against his wishes," and "he applied for unemployment benefits in a timely manner." Father also contends that the circuit court erred in refusing to revisit the finding of voluntary impoverishment in the temporary support order of December 2012, and compounded the mistake by finding him to be voluntarily impoverished at the 2014 trial despite his recent re-employment.

25

Mother counters that Father's challenge to the temporary order is untimely, and that, in any event, the circuit court acted within its discretion in determining Father's "potential income"[13] based on his employment potential and probable earnings level. Mother argues that the circuit court reasonably concluded that Father had made the free and conscious choice to render himself without adequate resources.

This Court in *Goldberger v. Goldberger,* 96 Md. App. 313, 327 (1993), defined voluntary impoverishment, stating:

> Accordingly, we now hold that, for purposes of the child support guidelines, a parent shall be considered "voluntarily impoverished" *whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.*

(Emphasis supplied). The factors to be considered in determining whether a parent is voluntarily impoverished are:

> (1) his or her current physical condition;
> (2) his or her respective level of education;
> (3) the timing of any change in employment or other financial circumstances relative to the divorce proceedings;
> (4) the relationship between the parties prior to the initiation of divorce proceedings;
> (5) his or her efforts to find and retain employment;
> (6) his or her efforts to secure retraining if that is needed;

---

[13] FL § 12-201(l) provides:

"Potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

(7) whether he or she has ever withheld support;
(8) his or her past work history;
(9) the area in which the parties live and the status of the job market there; and
(10) any other considerations presented by either party.

*Lorincz v. Lorincz*, 183 Md. App. 312, 331 (2008) (citing *Gordon v. Gordon,* 174 Md. App. 583, 645 (2007)); *Malin v. Mininberg,* 153 Md. App. 358, 396 (2003). Additionally, in *Wills v. Jones*, the Court of Appeals stated:

> It is true that parents who impoverish themselves "with the intention of avoiding child support ... obligations" are voluntarily impoverished. But, as the court recognized in *Goldberger*, 96 Md. App. at 326-27, 624 A.2d 1328, *a parent who has become impoverished by choice is "voluntarily impoverished" regardless of the parent's intent regarding his or her child support obligations.*

340 Md. 480, 494 (1995). Thus, it has been said that "voluntary impoverishment implies some downward movement or at least a deliberate failure to move upward." *Lorincz*, 183 Md. App. at 332. However, the subjective purpose of avoiding child support obligations is not necessary. *See Lorincz*, 183 Md. App. at 334-35; *see also Wills,* 340 Md. at 494-95 (recognizing that parents who impoverish themselves for reasons unrelated to avoiding child support nonetheless fall within class of persons to whom income can be imputed).

A trial court's factual findings on the issue of voluntary impoverishment of a parent, for child support purposes, are reviewed under a clearly erroneous standard, and the court's ultimate rulings are reviewed under an abuse of discretion standard. *Long v. Long*, 141 Md. App. 341, 351-52 (2001). In *Durkee v. Durkee*, we determined that, where "the evidence showed, and trial court clearly believed, that appellant had the capacity to earn a

27

substantial living, but had instead elected to pursue [a course resulting in] adverse financial consequences to the family," the court may consider an appellant's potential income and earning capacity for purposes of calculating support obligations. 144 Md. App. 161, 178 (2002). In calculating potential income the court is entitled to consider the party's prior employment and education. *Id.* at 186 (citing *Sczudlo v. Berry,* 129 Md. App. 529, 544 (1999)). "[S]o long as the factual findings are not clearly erroneous, 'the amount calculated is 'realistic', and the figure is not so unreasonably high or low as to amount to abuse of discretion, the court's ruling may not be disturbed.'" *Id.* at 187 (quoting *Reuter v. Reuter*, 102 Md. App. 212, 223 (1994) (internal citation omitted)).

Here, Father was employed at Sysco Food Services throughout the duration of the marriage and until he lost that job on October 5, 2012 (less than one week before he filed his original motion contesting paternity). According to Father's testimony, his employment with Sysco was about to be terminated for failure to adhere to certain quotas contained in an action plan for his job, and he resigned to protect his employment record. At the time Father left employment with Sysco his year-to-date income was $34,575.00. Father's 2011 W-2 indicated a total annual income of $49,187.00.

From October 15, 2012, through November 15, 2012, Father secured part-time employment as a marketing sales consultant for Harbor Spice, Inc., for which he was paid a $3,000.00 consulting fee. Father also engaged in some part-time work with Van Diver Inn until mid-November of 2012. Once his consultancy with Harbor Spice had

concluded, Father filed for unemployment. Father's initial unemployment application was denied in December of 2012; however, Father appealed that decision and was awarded unemployment benefits during 2013.[14]

According to the logs presented by Father, he made 36 contacts aimed at obtaining employment from June 10, 2013, through September 19, 2013; and only 54 contacts from November 2012 to May 2013, and his testimony reveals that some of those were repetitive. Moreover, as noted above, once Father obtained employment with Business Machines, he was quickly terminated through his own fault. On December 16, 2013, Father accepted a position as a route sales driver for Schwan Home Food Service at a salary of $30,000.00.

Father also owns a residential property that, at the time of the December 17, 2012, hearing, he was neither living in nor renting out. However, according to his testimony, he had rented the property in the past for $1,150.00 a month. Rather than live in the property himself, Father chose to rent another home. At the December 17, 2012, hearing, Father testified that he was renting a home from a friend for $350.00 per month. At the conclusion of that hearing, the circuit court found Father to be voluntarily impoverished for the purposes of the temporary support order, and stated:

> Why hasn't [Father] taken advantage of [the empty rental property]. He has that property available. He has a mortgage obligation of $800, but he chooses to then spend $350 a month to live elsewhere when he could be limited to the $800 a month and any other expenses as a result of residing in property that

---

[14] Father testified that, during his period of unemployment, he received $22,700.00 from unemployment and $14,000.00 from the rental property he owns.

he already has a mortgage on.

Ruling on the record, the circuit court announced the factors it considered:

[T]he Court has to consider the individual's current physical condition, prospective level of education, the timing of any change in employment or financial circumstances relative to the proceedings, efforts to find and retain employment, efforts to secure retraining, if that is needed, whether they have ever withheld support, any relevant past work history, the areas in which the parties live, and the status of the job market and any other considerations presented by either party.

The circuit court found: (1) that no health condition precluded Father from full employment; (2) Father possessed a level of education sufficient to work in a managerial capacity; (3) the timing of Father's failure to adhere to the action plan in his employment with Sysco was indicative of a pattern of behavior aimed at not maintaining full employment; (4) the relationship of the parties could only be described as acrimonious; (5) Father's efforts to obtain employment were repetitive and, once he found employment with Business Machines, he was terminated for cause after trying to persuade the employer to postdate his employment; (6) efforts to secure retraining were a non-factor; (7) Father had continually sought to withhold support for the child, maintaining that he had no support obligation despite that matter having already been adjudicated; (8) Father had been steadily employed with the Sysco for years prior to putting himself in the position of being terminated; (9) the local job market presented no problem in this case; and (10) this case "has really been fraught with a pattern of [Father] not wanting to pay child support . . . for a child already determined to be his." Accordingly, the circuit court found Father to have

voluntarily impoverished himself and imputed income to him in the amount of his previous employment with Sysco Food Services, $4,052.00 per month.

"Under the clearly erroneous standard, we look at the record in the light most favorable to the prevailing party, and if there is any competent, material evidence to support the circuit court's findings of fact, we cannot hold that those findings are clearly erroneous." *Fitzzaland v. Zahn,* 218 Md. App. 312, 322 (2014) (citation omitted). Plainly, the circuit court considered all of the enumerated factors in its analysis, and, viewing the evidence in the record in the light most favorable to Mother as the prevailing party, we cannot determine that there is no competent material evidence to support the findings of the circuit court. Therefore, we perceive no error in the circuit court's findings. In the context of its factual findings, the circuit court did not abuse its discretion in finding Father to be voluntarily impoverished and, thereby, calculating his child support obligation based on his reasonable imputed potential income.

**JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**