*Berry v. State*, No. 2402, September Term, 2018.  Opinion by Nazarian, J.

**RELIABILITY OF SCIENTIFIC EVIDENCE – DNA ADMISSIBILITY – REQUIRED PRODUCTION UNDER CJ § 10-915**

Under Courts and Judicial Proceedings ("CJ") § 10-915, the State may not provide required information under CJ § 10-915(c) in a practically inaccessible digital format that requires criminal defendants to hire an expert witness to obtain and use it.

Circuit Court for Baltimore City
Case No. 117198015

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2402

September Term, 2018
_____

CLARENCE BERRY

v.

STATE OF MARYLAND
_____

Nazarian,
Arthur,
Wells,

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: December 23, 2019

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Clarence Berry was convicted in the Circuit Court for Baltimore City of offenses relating to carjacking and robbery. He argues on appeal that the court erred by admitting DNA evidence taken from a pellet gun when the State did not provide accessible copies of the data required by Maryland Code (1973, 2013 Repl. Vol., 2019 Supp.), § 10-915 of the Courts and Judicial Proceedings Article ("CJ"), and by excluding extrinsic impeachment evidence during defense counsel's cross-examination of the victim. We agree that the State didn't follow CJ § 10-915 and that the evidence should have been subject to a *Frye-Reed* hearing before it was admitted, but disagree that the defense should have been able to enter extrinsic impeachment evidence. We vacate the judgments and remand for a *Frye-Reed* hearing on the DNA evidence admitted at trial.

## I.     BACKGROUND

### A.     Report of the Stolen Car and Mr. Berry's Arrest

In the early hours of June 21, 2017, Quinton Burns waited for his girlfriend to finish work on The Block in Baltimore City. Mr. Burns sat in his rental car, a Chrysler minivan, on Exeter Street, a few blocks away from her job, at around 2:30 a.m. The parties disagree about what happened next.

According to Mr. Burns, Clarence Berry, whom he testified he did not know personally, approached the passenger side of the van, asked for a cigarette, opened the unlocked door, and sat down in the car. Mr. Berry then pulled out what appeared to be a small black gun and said, "you know what time it is." He took some cash from Mr. Burns, told Mr. Burns to get out of the car, then drove the van away with Mr. Burns's cell phone still inside.

Mr. Berry, on the other hand, testified that he worked a "side security job" for Mr. Burns escorting his girlfriend from work to Mr. Burns's car at the end of the night. Mr. Berry testified that on June 21st, he "escorted [Mr. Burns's] girlfriend [] down to Exeter Street," where Mr. Burns was waiting in the parked car. Mr. Berry said that Mr. Burns had not paid Mr. Berry for this service in two weeks, and that he "just wanted to be paid." Mr. Berry asked for the $250 he was owed and testified that when Mr. Burns didn't have the money, the two compromised and agreed that Mr. Berry could borrow the van for three days. Mr. Berry told Mr. Burns that he could get the van back when Mr. Berry "got [his] money."

Soon after, Mr. Burns called the police and he was transported to the police station to provide a recorded statement.[1] He told Detective Frank Jenkins his version of the story:

> I was sitting on Exeter waiting for my, uh, girl to come up the street cause normally I would, I'd go down there and pick her up, it's on the block and she works on the block. So I've been having problems down there and stuff like that so I met her up the street. And she came up, um, as I was sitting there, I seen a couple dudes at the corner on Baltimore Street, but I didn't pay no mind, you know. So, he walked up there and he was like, um, "Excuse me, do you have a cigarette?" And I was like, "Yeah, hold on for a second." And he got in the car, he opened my passenger door open and sat in the car and said, "C'mon man, you know what time it is," and pulled out the gun.[2]

Mr. Burns also told police that he had seen Mr. Berry "quite a few times in the area." He

---

[1] Mr. Berry testified that Mr. Burns called the police out of fear because Mr. Berry knew about Mr. Burns's "activities" and was afraid that he might be exposed by Mr. Berry.

[2] The transcription, written verbatim, comes from this Court's review of the audio of Mr. Burns's statement to Detective Jenkins on June 21, 2017.

explained that he "used to see [Mr. Berry] standing on the corner" and that he thought Mr. Berry was homeless because "he hangs out with a lot of homeless dudes."

Police found Mr. Berry driving the van the next morning and placed him under arrest. When the police searched the van, they found a pellet gun in the center console. The police placed the pellet gun in the passenger seat before bagging it for evidence. Mr. Berry was charged with ten separate crimes stemming from his encounter with Mr. Burns the night before: (1) armed carjacking, (2) carjacking, (3) robbery with a dangerous weapon, (4) robbery, (5) second degree assault, (6) theft of more than $1,000 but less than $10,000, (7) theft of a motor vehicle, (8) theft of less than $1,000, (9) unauthorized use of property, and (10) possession or use of a pellet gun.

## B.    The DNA Evidence

Virginia Sladko, the State's laboratory technician and expert at trial, outlined during a pre-trial hearing the procedure she used to conduct the DNA analysis of the pellet gun. She explained that she tested swabs taken from the gun against a swab taken from Mr. Berry's cheek. She extracted the DNA from the swabs, estimated how much DNA was present, and amplified the data to make copies viewable in a diagram called an electropherogram.[3] Ms. Sladko saved electropherograms of the test samples to her file.

In addition to the test samples, Ms. Sladko tested control data, a "solution absent any DNA." The purpose of the control data analysis was to "detect any type of

_____

[3] "Electropherogram" means "[t]he densitometric or colorimetric pattern obtained from filter paper or similar porous strips on which substances have been separated by electrophoresis; may also refer to the strips themselves." Electropherogram, *Stedman's Medical Dictionary* (28th ed. 2006).

contamination" in the testing. Ms. Sladko created electropherograms for the controls as well, but she didn't keep them in her file. Ultimately, Ms. Sladko concluded that Mr. Berry's DNA was present on the pellet gun and that there was no contamination present.

The State gave Mr. Berry notice under CJ § 10-915 that it intended to use the DNA evidence at trial. CJ § 10-915 allows a party to bypass a traditional *Frye-Reed* hearing when the DNA is analyzed according to specific scientific standards *and* the party seeking to introduce the DNA evidence gave notice to the opposing party, as well as copies of the data when requested. The State sent him copies of the electropherograms from the test samples, the primary test results, and the raw data used in Ms. Sladko's analysis. But the raw data could only be opened using software called GeneMapper, which Mr. Berry's counsel didn't have. Defense counsel requested additional records, including records relating to "contamination, including [] instances of reagent blanks and/or negative controls registering the presence of DNA and[] positive controls registering the presence of DNA . . . ." The State responded that Mr. Berry was "[n]ot entitled" to that data and that the data did "not apply to the case in question." After considerable back-and-forth, the parties agreed that Mr. Berry's counsel could go to the State's lab to "look at" the raw data on the State's GeneMapper program. Defense counsel's requests for a paper copy of the control data, which would have taken around ten pages of paper to print, were denied repeatedly.

Mr. Berry moved to preclude Ms. Sladko's expert testimony at trial on the grounds that the defense didn't receive all the required disclosures under CJ § 10-915. The court

denied the defense's motion. At trial, the jury found Mr. Berry guilty of six of his ten charges: carjacking, robbery, second-degree assault, theft of a motor vehicle, unauthorized use of property, and possession or use of a pellet gun. Mr. Berry appeals.

We supply additional facts as needed below.

## II. DISCUSSION

Mr. Berry raises two questions on appeal that we rephrase.[4] *First*, did the court err when it allowed the State to admit DNA evidence under CJ § 10-915? *Second*, did the court err when it excluded extrinsic impeachment evidence Mr. Berry sought to introduce?

### A. The State Failed To Follow CJ § 10-915 And The Court Should Have Held A *Frye-Reed* Hearing To Determine The Evidence's Reliability.

Mr. Berry argues that the State failed to provide him with critical electropherograms of the control data[5] under CJ § 10-915(c)(2)(1), which required the State to give him

---

[4] Mr. Berry raised two Questions Presented:

> 1. Did the circuit court err by allowing the State, over objection, to rely on DNA profile evidence despite the State's failure to provide the Defendant with results from its analysis of the DNA profile in accordance with Maryland Court & Judicial Proceedings 10-915(c)?

> 2. Did the circuit court err by preventing the Defendant from impeaching the State's key witness with inconsistent statements from his recorded police station interview?

The State rephrased those Questions Presented as:

> 1. Did the trial court correctly find that the State complied with its obligation to disclose DNA evidence?

> 2. Did the trial court correctly exclude extrinsic evidence of the victim's alleged prior inconsistent statement?

[5] Mr. Berry also mentions that he "received no autoradiographs, no dot blots, no slot blots, and no strips or gels of any kind." This is misleading. There's no indication that the testing produced those forms of data. He argues, as he must, that he didn't receive

5

"control" data, or alternatively, "everything generated in the course of its analysis." Without those control electropherograms, he argues, he couldn't review the DNA evidence for contamination. The State responds that although it changed its policies and no longer sends control electropherograms to defendants, it complied with the statute because it gave Mr. Berry all of its *raw* data used in the analysis (in the digital .fsa format), and it sent accessible copies of the electropherograms from the main analysis.[6] Further, the State argues that the statute doesn't require it to provide the opponent with accessible copies of the positive and negative control data. Mr. Berry responds that the raw data the State gave him could only be opened using a program called GeneMapper, which the Office of the Public Defender doesn't have and can't purchase reasonably, and effectively requires criminal defendants to hire expert witnesses any time DNA evidence potentially is involved.

The question becomes one of basic access to DNA information and which party has the obligation to provide it. We hold that a proponent of DNA evidence must, as part of the statutory bargain of CJ § 10-915, provide the underlying DNA data, including control data, to opponents in an accessible form. And because it did not do so in this case, the State was not entitled to the *Frye-Reed* exemption that section provides, which in turn requires us to vacate the conviction and remand for further proceedings.

---

electropherograms of the control data, which are similar to autoradiographs used in old test procedures.

[6] The main analysis refers to the electropherogram displaying the data that used Mr. Berry's DNA.

We must determine *first* whether the DNA evidence introduced against Mr. Berry met the requirements of CJ § 10-915.[7] We will not set aside a trial court's factual findings unless they are clearly erroneous. *Phillips v. State*, 451 Md. 180, 189 (2017). But "[w]hen the trial court's decision involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the [trial] court's conclusions are legally correct." *Id.* (*quoting Bottini v. Dep't of Fin.*, 450 Md. 177, 187 (2016)). Resolving this issue requires us to interpret CJ § 10-915. "When construing a statute, our governing principle must be the Legislature's intent . . . ." *Armstead v. State*, 342 Md. 38, 56 (1996). To determine intent, we first look to the plain meaning of the statute. *Id.* "[I]f the language itself is clear and unambiguous and comports with the apparent purpose of the statute, there may be no need to consider other sources of information to glean the Legislature's purpose." *Id.* Further, "we 'do not read statutory language in a vacuum, . . . [r]ather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *Allen v. State*, 440 Md. 643, 667 (2014) (*quoting Gardner v. State*, 420 Md. 1, 9 (2011)).

CJ § 10-915(c)[8] describes the notice requirements and the materials that the

---

[7] The terms for admitting scientific evidence may be defined by statute, like CJ § 10-915, or established in a *Frye-Reed* hearing to determine whether the evidence meets the "general acceptance" of the scientific community. *Armstead*, 342 Md. 38, 54 (1996); *see Reed v. State*, 283 Md. 374, 381 (1978) ("[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field.").

[8] CJ § 10-915 was last amended in 2016 and the current version was in effect at the time of trial in 2018.

proponent of DNA evidence must provide to the other parties in advance:

> (c) In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile:
>
>> (1) Notifies in writing the other party or parties by mail at least 45 days before any criminal proceeding; and
>>
>> (2) **Provides**, if applicable and requested in writing, the other party or parties at least 30 days before any criminal proceeding with:
>>
>>> (i) First generation film copy or suitable reproductions of autoradiographs, dot blots, slot blots, silver stained gels, test strips, **control strips, and any other results generated in the course of the analysis**;
>>>
>>> (ii) Copies of laboratory notes generated in connection with the analysis, including chain of custody documents, sizing and hybridization information, statistical calculations, and worksheets;
>>>
>>> (iii) Laboratory protocols and procedures utilized in the analysis;
>>>
>>> (iv) The identification of each genetic locus analyzed; and
>>>
>>> (v) A statement setting forth the genotype data and the profile frequencies for the databases utilized.

(emphasis added). Here, the parties dispute whether the State was required to provide control electropherograms to Mr. Berry, so CJ § 10-915(c)(2)(i) is critical. The plain language of that section includes several scientifically obsolete terms: here, autoradiographs and control strips were not used in the DNA analysis. Instead, electropherograms, which are not explicitly identified in the statute, provided the primary visualization of both the test sample data and the control data. We are faced, then, with a

8

problem of whether the legislature intended CJ § 10-915 to be read to account for future advances to DNA technology.

In *Phillips*, an older version of CJ § 10-915 provided that the standards-setting organizations for the assessment of DNA profiles were The Technical Working Group on DNA Analysis Methods ("TWGDAM") or the DNA Advisory Board. Maryland Code (1973, 2013 Repl. Vol.), CJ § 10-915;[9] 226 Md. App. 1, 8 (2015), *aff'd Phillips v. State*, 451 Md. 180 (2017). However, the proponent of the DNA evidence had followed the "Federal Bureau of Investigation's Quality Assurance Standards," which was not permitted specifically by CJ § 10-915 at that time (because neither TWGDAM nor the DNA Advisory Board existed when the case was decided). To determine whether the proponent of the evidence could rely on the FBI's standards, then, we looked to "the legislature's intent and work[ed] to effectuate that intent in the present legal and factual landscape." *Phillips*, 226 Md. App. at 12. We determined that the legislature's reliance on scientific standards-setting boards meant that the legislature "intended to create a statute that would track cutting-edge DNA science and ensure automatic admissibility only if the DNA techniques complied with the standards promulgated by the most rigorous standards-setting body available." *Id.* at 14.[10] We held that the statute created an inference that courts could

---

[9] The legislature revised CJ § 10-915 in 2016 after *Phillips* was decided. At that time, however, the definition of "DNA profile" did *not* include standards by the "Federal Bureau of Investigation's Quality Assurance Standards." Md. Code (1973, 2013 Repl. Vol), CJ § 10-915. It now does. Md. Code (1973, 2013 Repl. Vol, 2019 Supp.), CJ § 10-915.

[10] In *Armstead*, the Court of Appeals reviewed the legislature's intent in passing CJ § 10-915, which we summarize. 342 Md. at 56–61. In 1989, the legislature created CJ § 10-915 to "render [DNA evidence] admissible without *Frye–Reed* analysis in each case." *Id.* at

9

rely on the Scientific Working Group on DNA Analysis Methods ("SWGDAM"), "both the successor entity and the successor 'in spirit' to both TWGDAM and the DNA Advisory Board,'" in place of the two non-existent entities. *Id.* On *certiorari* review, the Court of Appeals affirmed for a slightly different reason: although TWGDAM and the DNA Advisory Board no longer existed at the time, "[a]ll that is required for automatic admissibility under that provision is '[a] statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board.'" *Phillips*, 451 Md. at 203. The issue was not whether the entities themselves survived, but "[a]s long as the laboratory's procedures have been validated by standards previously established by one of these entities, and the analysis is performed in accordance with those validated procedures, then the analysis qualifies for automatic admissibility under the statute." *Id.*

*Sieglein v. Schmidt* also provides a useful analogy. 224 Md. App. 222 (2015). In *Sieglein*, this Court was faced with determining how to reconcile *in vitro* fertilization with the language of the parentage statute. At that time, the statute included the term "artificial insemination," but not "in vitro fertilization," which had not been invented when the statute

---

57 ("[T]he Senate Judicial Proceedings Committee's Report explicitly stated that '[t]he intent of the bill is to eliminate the necessity of holding a *Frye-Reed* hearing to prove that the technique has gained general acceptance in the relevant scientific community.'"). CJ § 10-915 was enacted "to save time and money" by eliminating the need for parties to expend "[v]aluable resources and great time" during *Frye-Reed* hearings when DNA evidence produced an "infinitesimal margin of error." *Id.* at 60–61. Accordingly, CJ § 10-915 confers a benefit upon the proponent of the evidence: if they follow the outlined procedures, they can bypass a *Frye-Reed* hearing and jump straight to general admissibility at trial. Here, that benefit was the State's.

had been enacted. *Sieglein*, 224 Md. App. at 238. We held that the parentage statute clearly contemplated technologies like *in vitro* fertilization when it mentioned children conceived by "artificial insemination," even if it didn't identify that precise technology. *Id.* at 242–43.

Mr. Berry does not contend here that the DNA evidence was collected or analyzed improperly. He argues that he did not receive in discovery the data the statute entitled him to receive. As we have noted, the technology listed in the statute itself may become outdated, but we can see that the legislature intended for the statute, and the corresponding discovery obligation, to track developments in technology. *Id.* Further, in cases where technology has advanced and the outdated statute includes terminology that contemplates future technology, we have held that the advanced technology applied under the outdated statute. *Id.* So although the statute mentions that the proponent of the evidence must provide "control strips," we can infer that the legislature intended for that language to apply to current control data, such as positive and negative control electropherograms.

*Next*, we must decide whether the raw .fsa data files that the State gave Mr. Berry satisfied its requirement to provide control data. Under the plain language of the statute, the proponent of the evidence must "provide[]" the other parties with both "control strips," as referenced above, and "any other results generated in the course of the analysis." CJ § 10-915(c)(2), (c)(2)(i). We must determine, then, whether *raw* data only accessible with GeneMapper is sufficient, or the data must be provided in an accessible form.

In April 2018, the State sent Mr. Berry digital "DNA Raw Data Files (13 .fsa files)" and electropherograms of the test samples, but it didn't send electropherograms of the

11

control data. The Office of the Public Defender ("OPD") couldn't open the DNA data files because it didn't have the GeneMapper software, which is expensive and designed for scientists, not lawyers. When defense counsel discovered that the State "failed to provide the electropherograms for the positive and negative control samples [and] the [reagent] blanks control," she attempted to obtain copies. The parties tried to schedule a visit where defense counsel could go to the State's lab, meet with the State's technician, and "view the raw data set–including the control electropherograms–on a computer terminal running the GeneMapper software." Defense counsel visited the lab once to meet with Ms. Sladko and found that Ms. Sladko was "concerned" when counsel requested the control electropherograms. Under a new state policy favoring digitization, Ms. Sladko said that she no longer kept printed or generally accessible copies of the control electropherograms she used in her analysis.

As the State conceded, to its credit, at oral argument, its policy of providing raw data files effectively required Mr. Berry (and any similarly situated defendant) to hire an expert witness to view the control data CJ § 10-915 entitled him to have. This policy and the resulting production are inconsistent with the statutory bargain CJ § 10-915 struck. The statute provides the State an evidentiary shortcut—an exemption from having to prove the scientific acceptance of certain DNA analysis techniques in a *Frye-Reed* hearing—if it uses approved technology and provides the required information to defendants so that they can decide how to respond. Under CJ § 10-915, opponents have the "opportunity, and the right, to challenge the expert's conclusion in cross-examination." *Young v. State*, 388 Md. 99, 121 (2005). Defendants may challenge whether they are the source of the DNA evidence,

cross-examine on the expert's conclusions and reliance on any statistics, and challenge the weight of the evidence by cross-examining the expert about potential contamination. *Id.* The statute requires the State to "provid[e] the *opponent* with detailed, case-specific information on the DNA analysis and giv[e] the opponent more time to evaluate the information before trial . . . [and] permit[] the *opponent* to attack the weight of the evidence through cross-examination." *Id.* at 121 (*quoting Armstead*, 342 Md. at 60) (emphasis added). But the State's policy decision unilaterally alters the bargain—defendants can't assess whether they need an expert unless they hire one, nor can they understand and scrutinize on their own what the State's DNA analysis reveals or prepare to cross-examine the State's witnesses on it.

The record in this case doesn't afford us an opportunity to examine the full range of alternative means by which the State could meet its discovery obligations under CJ § 10-915. We know that the old method of providing the required data in printed paper form worked, and we hold today that providing the statutorily required data in raw electronic form that requires an expert to reveal it does not. Perhaps the solution is as simple as having the State print and scan the documents it used to produce and send them electronically— we don't mean to prescribe a specific method, so long as the opponent emerges from the process with the data required by CJ § 10-915 in a form that can be reviewed and utilized, as the statute intends, by counsel.

This leaves the question of the appropriate remedy. The evidentiary shortcut authorized by CJ § 10-915 does not lead all the way to admissibility, but only obviates the need for a *Frye-Reed* hearing to determine whether the underlying scientific methods have

13

gained the necessary level of scientific acceptance. The only consequence, then, from the State's failure to provide the DNA data in a manner that complied with CJ § 10-915 was that it was able to offer the DNA data in this case without a *Frye-Reed* hearing that, all else being equal, Mr. Berry was entitled to seek. Accordingly, we vacate Mr. Berry's convictions and remand the case to allow an opportunity for the State to produce the information required by CJ § 10-915 and for Mr. Berry to seek a *Frye-Reed* hearing. If, after these proceedings, the court determines that the methods used to analyze the DNA evidence failed the *Frye-Reed* test, Mr. Berry is entitled to a new trial; if they do pass muster, the convictions may be reinstated.

**B.    The Court Properly Excluded Extrinsic Evidence Of Mr. Burns's Statement To Police.**

*Next*, Mr. Berry argues that the court improperly excluded extrinsic impeachment evidence, Mr. Burns's statement to police, under Maryland Rule 5-613. Mr. Berry argues that we should apply the hearsay standard of review (*de novo*) because the trial court mentioned Rule 5-801 in its ruling. However, we agree with both sides that the impeachment evidence in question was not hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "In any hearsay analysis, the first step is to identify what the extrajudicial statement was offered to prove." *Devincentz v. State*, 460 Md. 518, 553 (2018). When a statement is offered to prove its truth, it is inadmissible hearsay. *Id.*

But when evidence is offered only to impeach a witness and not as substantive

14

evidence, it is not hearsay. *Id.* at 555 ("We have recognized that '[u]se of a statement for impeachment purposes is not hearsay, since only the fact that the statement was made is being offered, not the truth of the statement.'") (emphasis omitted). Impeachment evidence is analyzed differently: "The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving under Rule 5-613 that the witness has made statements that are inconsistent with the witness's present testimony." Md. Rule 5-616(a)(1).

Here, Mr. Berry intended to impeach Mr. Burns to attack his credibility, not to enter the recording as substantive evidence, so we review for abuse of discretion the decision not to allow Mr. Berry to impeach Mr. Burns with his earlier statement to police. *See Brooks v. State*, 439 Md. 698, 708 (2014). "An abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 189 Md. App. 310, 364 (2009) (*quoting King v. State*, 407 Md. 682, 697 (2009)). "[W]hether a trial court abused its discretion 'usually depends on the particular facts of the case and the context in which the discretion was exercised.'" *King*, 407 Md. at 696 (alterations in original).

Mr. Berry argues that the court erred by excluding the recorded police interview to impeach Mr. Burns with two factual inconsistencies: Mr. Burns's girlfriend's location at the time of the carjacking, and the nature of Mr. Burns's relationship with Mr. Berry. He argues that the trial court improperly applied the hearsay rule to an impeachment issue. And although he's right that the court's reference to the hearsay rule was misplaced, the

recording could not have been played for the jury because it didn't meet the requirements

of Rules 5-613 and 5-616.

Maryland Rule 5-613 drives the analysis of whether Mr. Burns's recorded police

interview should have been allowed as extrinsic impeachment evidence:

> (a) **Examining witness concerning prior statement.** A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

> (b) **Extrinsic evidence of prior inconsistent statement of witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

In *Brooks v. State*, the Court of Appeals simplified the procedural requirements of

Rules 5-613 and 5-616[11] by creating a four-part checklist for the entry of extrinsic

---

[11] Maryland Rule 5-616(a)(1) provides:

> (a) The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

> > (1) Proving under Rule 5-613 that the witness has made statements that are inconsistent with the witness's present testimony[.]

It later states that "[e]xtrinsic evidence of prior consistent statements may be admitted as provided in Rule 5-613(b). Md. Rule 5-616(b)(1).

impeachment evidence. 439 Md. at 716. *First*, "[t]he content of the statement and the circumstances under which it was made, including the person(s) to whom it was made, must be disclosed to the witness who is being impeached before the end of that witness's examination." *Id.* at 717 (italics omitted); *see* Md. Rule 5-613(a)(1), (b)(1). Here, defense counsel told Mr. Burns during cross-examination that she was referring to his recorded interview with police, the circumstances of the statement, and specifically his statement to Detective Jenkins, the person to whom it was made, so this first prong was met. *Second*, the witness "must be given an opportunity to explain or deny the allegedly inconsistent statement." *Brooks*, 439 Md. at 717 (italics omitted); *see* Md. Rule 5-613(a)(2), (b)(1). This happened as well: Mr. Burns had the opportunity to explain or deny his statements throughout cross-examination.[12]

*Third*, "[t]he witness must have 'failed to admit having made the statement.'" *Brooks*, 439 Md. at 717 (*quoting* Md. Rule 5-613(b)(1)) (italics omitted). So for Mr. Berry to enter extrinsic impeachment evidence, Mr. Burns must have denied making the statements in the police interview.[13] But he didn't deny his statement to police either as to

---

[12] Although we don't recount each of the defense's questions contrasting Mr. Burns's testimony to his statement here, we have identified at least fourteen instances where defense counsel impeached Mr. Burns using information in the recorded statement.

[13] In *Brooks v. State*, the Court of Appeals held that the following qualified as a denial:

> [DEFENSE COUNSEL]: Just listen to my question. Did you or did you not tell Officer Faby or some other uniformed officer that evening at your house when they arrived that you had Wardell Brooks over your house about 7:30 that evening?
>
> [LAURA B.]: No.
>
> [DEFENSE COUNSEL]: Did you or did you not?

the testimony on the girlfriend's whereabouts or the nature of the parties' prior relationship, and the analysis stops there.

### 1. Mr. Berry Did Not Deny His Statement About His Girlfriend's Location.

*First*, Mr. Berry argues that the police recording "captured Mr. Burns clearly stat[ing] that his girlfriend 'came up' before he interacted with Mr. Berry." He claims that at trial, Mr. Burns "paraphrased that he told the detective that his girlfriend was walking up the street, but he was unwilling to state plainly that he told the detective his girlfriend 'came up' to the car." ANT. 24. Even taking this argument at face value, Mr. Berry fails to establish that Mr. Burns denied making the statement, as Rule 5-613 requires.

The short portion of Mr. Burns's statement regarding his girlfriend is as follows:

> I was sitting on Exeter *waiting for my, uh, girl to come up* the street cause normally [] I'd go down there and pick her up . . . . So, I've been having problems down there and stuff like that so I met her up the street. *And she came up*, um, as I was sitting there, I seen a couple dudes at the corner on Baltimore Street, but I didn't pay no mind, you know. So [the robber] walked up there . . . .

(emphasis added). Mr. Burns indicates that he was waiting for his girlfriend and that she came up.[14] Mr. Burns clarified and contextualized his brief statement in the interview that his girlfriend "came up" the street:

> [DEFENSE COUNSEL]: Now in your initial statement to the responding officer, the one that you finally called for . . . isn't

---

[LAURA B.]: No.

439 Md. at 711. Defense counsel in that case asked in direct terms whether the witness made a particular statement to police and the witness denied making it. *Id.*

[14] Detective Jenkins testified that Mr. Burns told him he was waiting for his girlfriend during their interview.

it true that **you advised them that you were waiting** to pick up your girlfriend and she was coming up the block?

MR. BURNS: Yes.

***

[DEFENSE COUNSEL]: And just to clarify, in your statement to Detective Jenkins that was recorded, you indicated and you said quote "and she came up" meaning you were talking about your girlfriend; right?

MR. BURNS: I'm sorry. Say that again.

[DEFENSE COUNSEL]: You said and she came up. You were referring to your girlfriend indicating she was there?

MR. BURNS: No.

***

[DEFENSE COUNSEL]: Okay. So if we played your statement back, we wouldn't hear you say and she came up about your girlfriend, [] that your girlfriend was coming up? She was coming up the block.

MR. BURNS: Yes. Like not saying that she's coming up the block and standing and sit[ting] in my car. She probably was coming up the block to meet me.

(emphasis added).

Mr. Burns clarified repeatedly that his girlfriend was *on her way* to the car when the carjacking happened. And he offered additional context after he listened to his recorded statement to refresh his recollection:

[DEFENSE COUNSEL]: Let's go back to the girlfriend. Your girlfriend was walking up. Isn't that what you indicated on your statement?

MR. BURNS: I clarified to you again that as I was sitting there waiting she was on her way up the street. By the time she got up the street the car was gone. That's exactly what I clarified to you.

[DEFENSE COUNSEL]: Now–but would–you just listened to your statement and isn't that true that's not what you said on your statement?

19

MR. BURNS: **That's [] what I said in the statement.** You just showed me the statement that my girlfriend was walking up the street and I just–and then when you asked me that question I answered the question to you–I answered your question and said, yes, my girlfriend was walking up [] the street to me as I'm sitting there waiting [] on her cousin. But by the time she got–from Baltimore Street where she work at all the way [to] Exeter, you know that's like three [] blocks up, right, three long blocks up. Okay. And she's walking up the street. By the time she got up there the car was gone. . . .

(emphasis added). The inconsistencies of language aside, Mr. Burns never denied telling the detective that his girlfriend was "com[ing] up the street" or, alternatively, that "she came up." *See Brooks*, 439 Md. at 717 (stating that the third requirement was met when a witness "denied having made the allegedly inconsistent portion of the statement").

### 2. Mr. Burns Did Not Deny That He Had Seen Mr. Berry Prior To The Carjacking.

*Second*, Mr. Berry argues that he should have been able to impeach Mr. Burns with his statement after Mr. Burns testified at trial about his relationship with Mr. Berry. He offers no substantive argument on this point in his brief, but in the police recording, Mr. Burns stated that he had "seen [Mr. Berry] a couple times. . . . [Q]uite a few times in the area." And he had observed that "[Mr. Berry] hangs with a lot of homeless dudes." At trial, when defense counsel asked specifically about his statement, Mr. Burns denied knowing Mr. Berry, but didn't deny making any portion of his statement to police:

> [DEFENSE COUNSEL]: Okay. And at [the time Mr. Berry entered the van] did you tell him here's a cigarette, get out or what are you doing?

> MR. BURNS: I didn't get a chance to do it. He pulled a gun out. . . .

20

[DEFENSE COUNSEL]: But isn't it really true that the reason why you didn't say anything to him because you knew [Mr. Berry], you know–

MR. BURNS: I don't know anyone. I don't know anyone.

[DEFENSE COUNSEL]: Didn't you tell [] Detective Jenkins and finally admit that you *knew* the–

MR. BURNS: No.

[DEFENSE COUNSEL]: –the person who was the suspect?

MR. BURNS: No. I didn't know–I don't know nobody on the block. I know like a handful of people.

\*\*\*

[DEFENSE COUNSEL]: So if you told the detectives that you really did know this guy, you might not know his name, *but you knew him*, you would have been lying then to the detectives, yes or no?[15]

MR. BURNS: Why would I [] even have a conversation with somebody I don't know? I don't [] conversate with nobody on the block. I don't conversate with anyone.

[DEFENSE COUNSEL]: Okay.

MR. BURNS: Especially if I don't know their name. . . .

(emphasis added).

Defense counsel repeatedly asked whether Mr. Burns "knew" Mr. Berry, but he never indicated that he knew Mr. Berry in his police statement. After defense counsel attempted to impeach Mr. Burns with a statement he never made, she asked the court if Mr. Burns could listen to the statement to refresh his recollection. The court allowed a

---

[15] A portion of the preceding testimony is muddled by defense counsel and Mr. Burns speaking over one another. Defense counsel asked, "You've never seen him before in your life?" to which Mr. Burns replied that he had not, a fact inconsistent with his statement to police. Defense counsel did not reach a question regarding whether Mr. Burns denied telling Detective Jenkins that he had seen Mr. Berry before because she and the witness spoke over one another. Her next full question, after a brief admonishment from the court, is the question included above.

21

recess for Mr. Burns to review the statement and defense counsel's notes. After the recess, defense counsel asked a more on-point question, and Mr. Burns responded consistently with his statement:

> MS. COHEN: [] Do you recall saying after listening to [the statement] that you've seen him a couple of times, you know him from that area?
>
> MR. BURNS: Now I remember a couple–**yes, I seen him hanging with the homeless guys.**
>
> ***
>
> MR. BURNS: I don't know him. I've seen him. Knowing him and seeing him is two different things. Like I could sit here, I don't know your name, but I've seen you. . . .

(emphasis added).

At no point did defense counsel establish that Mr. Berry denied having made this portion of the statement to police. And without an outright denial that he made that portion of the statement to police, Mr. Berry didn't meet the third requirement of Rule 5-613, and his statement to police was excluded properly.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2402s18cn.pdf